**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **WILLIAM CHARLES MORVA,** | ) | Civil Action No. 7:13-cv-00283 |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **KEITH W. DAVIS,** | ) | By:   Michael F. Urbanski |
| Respondent. | ) | United States District Judge |

William Charles Morva ("Morva"), a Virginia inmate proceeding with counsel, filed a

petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, Dkt. No. 111, challenging the

sentences of death imposed by the Circuit Court of Montgomery County, Virginia ("circuit court")

on August 25, 2008.  Respondent, who is the Warden of the Sussex I State Prison ("Warden"),

moved to dismiss the petition, Dkt. Nos. 67, 120, Morva responded, and the court held a hearing on

October 24, 2014.  After exhaustively reviewing the record and considering the parties' arguments,

the court finds that Morva's counsel were not ineffective and that his capital murder trial did not

otherwise violate the laws or Constitution of the United States.  As such, the Warden's motions to

dismiss must be **GRANTED**.

I.    **Factual and Procedural History**

Following an eight day trial held in March 2008, a jury convicted Morva of assault and

battery on Montgomery County Sheriff's Deputy Russell Quesenberry, in violation of Virginia Code

§ 18.2-57; escape with force by a prisoner, in violation of Virginia Code § 18.2-478; one count of

capital murder for killing hospital security guard Derrick McFarland while a prisoner, in violation of

Virginia Code § 18.2-31(3); one count of capital murder for killing Montgomery County Sheriff's

Deputy Corporal Eric Sutphin, in violation of Virginia Code § 18.2-31(6); one count of

capital murder for committing premeditated murders of more than one person within a three-year period,

in violation of Virginia Code § 18.2-31(8); and two counts of using a firearm in the commission of murder, in violation of Virginia Code § 18.2-31. The jury based its decision on the following facts, as recited by the Supreme Court of Virginia:

> In the summer of 2006, Morva was in jail awaiting trial on charges of attempted burglary, conspiracy to commit burglary, burglary, attempted robbery, and use of a firearm. He had been in jail for approximately one year. While in jail he wrote a letter to his mother stating, "I will kick an unarmed guard in the neck and make him drop. Then I'll stomp him until he is as dead as I'll be."
>
> Morva was scheduled to go to trial on August 23, 2006. In the evening on August 19, 2006, he informed the jail personnel that he required medical attention due to an injury to his leg and forearm. During the early morning hours of August 20, 2006, Sheriff's Deputy Russell Quesenberry, who was in uniform and armed with a Glock .40 caliber semi-automatic pistol, transported Morva to the Montgomery Regional Hospital located in Montgomery County. Morva was wearing waist chains, but Deputy Quesenberry did not secure Morva's allegedly injured arm. Upon arrival at the hospital, Morva "kept trying" to walk on Deputy Quesenberry's right side even though he was ordered to walk on Deputy Quesenberry's left side. Quesenberry was required to have Morva walk on his left because Quesenberry wore his gun on his right side. Quesenberry observed that Morva's limping was sporadic and "sort of went away." Also, Nurse Melissa Epperly observed Morva walking as if he were not injured.
>
> After the hospital treated Morva, Morva requested to use the bathroom. Deputy Quesenberry inspected the bathroom and allowed Morva access. While in the bathroom, Morva removed a metal toilet paper holder that was screwed to the wall. As Deputy Quesenberry entered the bathroom, Morva attacked him with the metal toilet paper holder, breaking Quesenberry's nose, fracturing his face, and knocking him unconscious. Morva then took Quesenberry's gun. Prior to leaving the bathroom, Morva confirmed that Quesenberry's gun was ready to fire, ejecting a live round from the chamber.
>
> After escaping from the bathroom, Morva encountered Derrick McFarland, an unarmed hospital security guard. Morva pointed Quesenberry's gun at McFarland's face. McFarland stood with his

2

hands out by his side and palms facing Morva. Despite McFarland's apparent surrender, Morva shot McFarland in the face from a distance of two feet and ran out of the hospital, firing five gunshots into the electronic emergency room doors when they would not open. McFarland died from the gunshot to his face.

In the morning of August 21, 2006, Morva was seen in Montgomery County near "Huckleberry Trail," a paved path for walking and bicycling. Corporal Eric Sutphin, who was in uniform and armed, responded to that information by proceeding to "Huckleberry Trail."

Andrew J. Duncan observed Morva and then later observed Corporal Sutphin on "Huckleberry Trail." Four minutes later, Duncan heard two gunshots, less than a second apart. David Carter, who lived nearby, heard shouting, followed by two gunshots, and saw Corporal Sutphin fall to the ground.

Shortly thereafter, Officer Brian Roe discovered Corporal Sutphin, who was dead from a gunshot to the back of his head. Corporal Sutphin's gun was still in its holster with the safety strap engaged. Officer Roe confiscated Corporal Sutphin's gun to secure it and continued to search for Morva.

Later that day, Officer Ryan Hite found Morva lying in a ditch in thick grass. Even though Morva claimed to be unarmed, officers discovered Quesenberry's gun on the ground where Morva had been lying. Morva's DNA was found on the trigger and handle of Quesenberry's gun.

Morva v. Commonwealth, 278 Va. 329, 335-37, 683 S.E.2d 553, 556-57 (2009).

During the sentencing phase of trial, the jury heard testimony from Dr. Bruce Cohen, a forensic psychiatrist, and Dr. Scott Bender, a neuropsychologist, both from the Institute of Law, Psychiatry, and Public Policy in Charlottesville, Virginia.[1] After conducting numerous psychological

---

[1] Before trial, the circuit court granted trial counsel's motion to appoint a mental health expert and a mitigation specialist to assist with trial. Although trial counsel initially requested a specific psychologist from Philadelphia, the circuit court appointed Dr. Bruce Cohen. The circuit court also appointed Dr. Bender, on trial counsel's motion, to aid Dr. Cohen. Dr. Bender performed certain psychological tests on Morva to help develop Dr. Cohen's forensic evaluation. The circuit court also appointed Dr. Leigh Hagan, a psychologist, to prepare a Capital Sentencing Evaluation for the Commonwealth. However, the circuit court denied trial counsel's motion to appoint an expert on prison-risk

3

tests, Dr. Bender identified two "DSM-IV Diagnostic Possibilities:" Somatoform Disorder NOS (not otherwise specified), which is an Axis-I disorder, and a Personality Disorder NOS (not otherwise specified) (Mixed Personality Disorder with Schizotypal, Narcissistic, Antisocial, and Paranoid Features), which is an Axis-II disorder.[2] State Habeas Appendix ("SHA") Vol. 6, at 2486.[3] Relying on documents, his own interviews, and Dr. Bender's determinations, Dr. Cohen concluded that "Morva's life story and overall clinical presentation are indicative of a diagnosis of schizotypal personality disorder." SHA Vol. 6, at 2467; Direct Appeal Joint Appendix ("Direct Appeal JA") at 2325. Dr. Cohen did not find that Morva's schizotypal personality disorder constituted an "extreme mental or emotional disturbance at the time of the offenses" or that it significantly impaired Morva's capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law[.]" SHA Vol. 6, at 2466; Direct Appeal JA at 2324-25, 2353; see, e.g., Va. Code Ann. § 19.2-264.3:1(A), (C). However, Dr. Cohen testified that Morva's schizotypal personality disorder served as a mitigating factor against imposing a death sentence. Direct Appeal JA at 2353-54.

After hearing substantial mitigation evidence, including testimony from Dr. Bender and Dr. Cohen, the jury recommended sentences of death for each of the three capital murder convictions and a total term of sixteen years' incarceration for the other convictions. The circuit court's August

---

assessments, and the facts related to this denial are discussed below in claim I.

[2] Both of these diagnoses were based on the Fourth Edition of the American Psychiatric Association's Diagnostic and Statistical Manual ("DSM-IV").

[3] Copies of Dr. Cohen and Dr. Bender's reports were attached to the respondent's motion to dismiss in state habeas proceedings before the Supreme Court of Virginia. The court cites the copies filed in Volume 6 of the state habeas appendix for convenience.

25, 2008 sentencing order imposed the jury's recommended sentences.  Direct Appeal JA at 413-15.[4]
On appeal, the Supreme Court of Virginia affirmed the convictions and sentences, finding "no
reversible error" and "no reason to set aside the sentences of death."[5]  Morva v. Commonwealth,
278 Va. at 355, 683 S.E.2d at 568.

Following the denial of the direct appeal, the circuit court appointed two licensed Virginia
attorneys ("state habeas counsel"), who were specially qualified under Virginia Code § 19.2-163.7 to
represent Morva in state habeas proceedings.  On December 3, 2010, state habeas counsel filed a
petition for a writ of habeas corpus and five volumes of appendices with the Supreme Court of
Virginia.[6]  The Warden filed a motion to dismiss supported with exhibits, including affidavits, on
January 4, 2011.

Between February 4, 2011, and April 3, 2013, Morva filed five motions for leave to
supplement the record and one motion to amend the petition.[7]  During that same time, Morva also

---

[4] An amended sentencing order was entered on October 8, 2008.  Direct Appeal JA at 419-21.

[5] The Supreme Court of the United States denied a petition for a writ of certiorari from that decision.  Morva v. Virginia,
131 S. Ct. 97 (2010).

[6] The first volume of Morva's exhibits consisted of fifty-nine affidavits, primarily from Morva's family, friends, teachers,
and a physician. The remaining four volumes consisted primarily of multigenerational historical records about Morva's
maternal and paternal families, Morva's educational records, jail and police records for Morva and his brother, Michael,
and Michael's medical and military records.

[7] On February 4, 2011, Morva moved for leave to supplement the record with a sixth appendix volume.  On April 13,
2011, Morva filed a second motion for leave to supplement the record, seeking to replace blank pages in Volume II of
the appendix with seven pages relating to immigration records of Morva's father.  On May 11, 2012, Morva filed a third
motion for leave to supplement the record with documents establishing that Morva is a citizen of Hungary.  On August
31, 2012, Morva filed a fourth motion for leave to supplement the record to add an affidavit from Dr. Dale G. Watson, a
clinical psychologist who reviewed documents produced before, during, and after Morva's trial and proffered, inter alia,
that Morva needed another mental health evaluation to determine whether Morva suffers from an Axis-I disorder.  On
April 3, 2013, Morva filed a motion for leave to amend the petition and also to supplement the habeas appendix with
evidence supporting the amendment.  Morva sought the amendment to include a person's statement to the police that
he drove Morva to downtown Blacksburg without knowing Morva had just escaped and killed McFarland.  The Warden
objected to all of the motions to amend and to supplement except for the inclusion of Drs. Cohen, Bender, and Hagan's

5

pursued motions for discovery, for appointment of mental health experts, and for an evidentiary hearing to support the claims set forth in the petition and exhibits.[8] On April 12, 2013, the Supreme Court of Virginia denied all of these motions, considered "[t]he exhibits contained in the [five] appendices . . . pursuant to the appropriate evidentiary rules[,]" and granted the Warden's motion to dismiss the habeas petition. Morva v. Warden of the Sussex I State Prison, 285 Va. 511, 525, 741 S.E.2d 781, 792 (2013).

## II.    Morva's Federal Habeas Claims

Thereafter, Morva timely commenced this action with the assistance of new habeas counsel appointed by this court, and the court stayed Morva's execution pursuant to 28 U.S.C. § 2251(a)(3). The petition ripe for adjudication is Morva's second amended petition for a writ of habeas corpus prepared by counsel, Dkt. No. 111.[9] Morva presents the following twelve claims in the instant petition:

    I.        The circuit court's denial of the assistance of a risk assessment expert on the issue of future dangerousness violated the Eighth and Fourteenth Amendments;

---

mental health evaluations in the sixth appendix volume because the Warden had already attached these reports to the motion to dismiss.

[8] The motion for discovery sought permission to explore the conditions Morva experienced at the Montgomery County Jail and to depose certain persons, including trial witness Jennifer Preston; Morva's co-defendants on the burglary and robbery charges; two additional teachers at Blacksburg High School; and Laura Eichenlaub, the counselor at the Montgomery County Jail who completed an intake form on Morva following his arrest on the underlying charges. The motion for appointment of mental health experts was made in furtherance of Morva's belief that he suffers from an Axis-I disorder and that the diagnosis of this more severe mental disease would have caused the jury, had it known of it, to impose life sentences. Morva subsequently sought to supplement the motion for appointment of mental health experts with Dr. Watson's affidavit and with an unverified "preliminary report" from Dr. Leslie Lebowitz, another clinical psychologist. Dr. Lebowitz proffered that Morva may have experienced traumatic events during his childhood that may have affected Morva's behavior and actions as an adult and that evaluation by a trauma specialist was needed.

[9] Morva filed a pro se petition for a writ of habeas corpus, Dkt. No. 61, which the court dismissed without prejudice. Dkt. No. 115. Morva was already represented by counsel, and the pro se claims were either procedurally defaulted and unexcused or touch upon the claims raised in the instant petition, which, as discussed herein, do not warrant relief.

II. (A) Morva was visibly restrained during trial in violation of due process, and (B) trial counsel rendered ineffective assistance by not objecting to the visible restraints;

III. The circuit court's exclusion of venirewoman Mary Blevins violated the Sixth and Fourteenth Amendments' guarantees of a fair trial and an impartial jury;

IV. Trial counsel rendered ineffective assistance by stipulating that Morva was "a prisoner imprisoned and in lawful custody" during his escape on August 20 and 21, 2006;

V. Trial counsel rendered ineffective assistance by not investigating and challenging forensic and other evidence relating to the two shootings;

VI. Trial counsel rendered ineffective assistance by not investigating and presenting evidence about conditions of confinement at the Montgomery County Jail to support a claim of imperfect self-defense;

VII. Jury Instruction 8A violated the Fourteenth Amendment's right to due process;

VIII. Trial counsel rendered ineffective assistance by (A) not making a double jeopardy objection to the third capital murder charge, and (B) not offering an instruction against triple-counting the capital murder charges and not objecting to the duplicative jury instructions and duplicative verdict forms that misled the jury into sentencing Morva to death;

IX. Trial counsel rendered ineffective assistance by not (A) conducting an adequate investigation of Morva's background, history, character, and mental illness; (B) providing the available information to the mental health experts to ensure an accurate and reliable mental health evaluation; and (C) adequately presenting all available mitigating evidence during the sentencing phase;

X. Trial counsel rendered ineffective assistance by not ensuring that Morva had constitutionally adequate expert assistance;

XI. Trial counsel rendered ineffective assistance by not investigating and presenting powerful mitigation evidence that Morva had saved a man's life and helped the Commonwealth prosecute the man's assailant; and

XII. Morva's death sentence based on a finding of depravity of mind, as permitted by Virginia Code § 19.2-264.4(C), violates the Eighth and Fourteenth Amendments.

The Warden filed motions to dismiss the second amended petition, which are before the court for decision.[10]

## III. Overview of Analytical Framework

### A. Legal Standard

For each of Morva's twelve claims for relief, the court must consider the threshold issue of whether the claim is procedurally defaulted. A claim is procedurally defaulted if: "(1) the state court relied on an adequate and independent state procedural rule to deny relief on that claim, Fisher v. Angelone, 163 F.3d 835, 844 (4th Cir.1998); or (2) the petitioner failed to present a claim to the state court and that claim may not now be presented, Gray v. Netherland, 518 U.S. 152, 161–62, (1996); Bassette v. Thompson, 915 F.2d 932, 936 (4th Cir. 1990)." Bell v. True, 413 F. Supp. 2d 657, 676 (W.D. Va. 2006), aff'd sub nom. Bell v. Kelly, 260 F. App'x 599 (4th Cir. 2008). As discussed infra, claim II(A) falls into the first category of procedurally defaulted claims, and claims IV and VIII(B) fall into the second. If a claim is determined to have been procedurally defaulted, it is barred from federal habeas review unless the petitioner "can show that cause and prejudice or a fundamental miscarriage of justice might excuse his default." Bell, 413 F. Supp. 2d at 676 (citing Fisher, 163 F.3d at 844).

The bulk of Morva's claims were presented to the Supreme Court of Virginia, either on direct appeal or in his state habeas petition, and are not procedurally defaulted. For these claims, the

---

[10] The second amended petition filed on September 8, 2014, Dkt. No. 111, amended claim IX following the forensic psychiatric evaluation performed by Dr. Donna Schwartz-Watts. The second amended petition was unchanged regarding Morva's other claims. After the second amended petition was filed, the Warden filed a motion to dismiss and supporting memoranda that addressed only amended claim IX. Dkt. Nos. 120, 121. As regards the other claims, the Warden incorporated by reference the arguments made in connection with the motion to dismiss the first amended petition. As a consequence, the court must consider and address the arguments raised in both motions to dismiss, Dkt. Nos. 67 and 120, and the briefs associated therewith.

court must review the state court's decision on the merits, pursuant to 28 U.S.C. § 2254. A federal court conducting habeas review is limited to determining whether a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, the court may grant habeas relief only if the state court's adjudication of a claim is (1) contrary to, or an unreasonable application of, clearly established federal law, or (2) based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

A state court determination is "contrary to" clearly established federal law[11] if it "arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). A state court determination is an "unreasonable application of" clearly established federal law if the state court "identifies the correct governing legal principle from [the United States Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. This reasonableness standard is an objective one. Id. at 410. "It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous . . . . Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal citations and quotations omitted). Review of a state court's legal determination involving clearly established federal law "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. ___, 131 S. Ct. 1388, 1398 (2011).

---

[11] "Clearly established federal law" refers to the "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).

A state court's factual determination is entitled to a "presumption of correctness," which can only be rebutted by "clear and convincing" evidence that the state court's decision was "based on [an] unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2), (e)(1); see Bell, 413 F. Supp. 2d at 676. The presumption applies equally to the factual findings of state courts that conducted post-conviction proceedings. Howard v. Moore, 131 F.3d 399, 422 (4th Cir. 1997) (citing Rushen v. Spain, 464 U.S. 114 (1983) (per curiam), and Johnson v. Maryland, 915 F.2d 892, 896 (4th Cir. 1990)). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010).

Even if a writ of habeas corpus is authorized under § 2254(d), a petitioner still is not entitled to relief unless he can show that any constitutional error committed had a substantial and injurious effect or influence on the jury's verdict. Wilson v. Ozmint, 352 F.3d 847, 855 (4th Cir. 2003).

> If this standard is difficult to meet, that is because it was meant to be. As amended by [the Antiterrorism and Effective Death Penalty Act], § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the United States Supreme] Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted).

### B. Standard Applicable to Claims of Ineffective Assistance of Counsel

A number of Morva's claims raise arguments of ineffective assistance of counsel.[12]  A petitioner claiming ineffective assistance of counsel must satisfy the two-pronged test set forth in Strickland v. Washington, 466 U.S. 668 (1984).  The first prong of Strickland requires a petitioner to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment[,]" meaning that counsel's representation fell below an objective standard of reasonableness.  Strickland, 466 U.S. at 687-88.

The second prong of Strickland requires a petitioner to show that counsel's deficient performance prejudiced him by demonstrating a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different."  Id. at 694.  "A reasonable probability is a probability sufficient to undermine the confidence of the outcome."  Id.  It is not enough "'to show that the errors had some conceivable effect on the outcome of the proceeding.'

---

[12] For instance, Morva argues that trial counsel's failure to raise claim II(A) and state habeas counsel's failure to raise claims IV and VIII(B) constitute ineffective assistance and cause to excuse the procedural defaults of those claims.  With respect to claims IV and VIII(B), Morva cites Martinez v. Ryan, ___ U.S. ___, 132 S. Ct. 1309 (2012), for the proposition that a procedurally defaulted, substantial claim of ineffective assistance of trial counsel could be considered if habeas counsel rendered ineffective assistance, or no counsel was provided, during the initial state collateral proceeding.

Morva also raises ineffective assistance arguments in claims II(B), V, VI, VIII(A), IX, X, and XI.  With respect to these claims, "double deference is required – deference to the state court judgment granting deference to trial counsel's performance."  Burr v. Lassiter, 513 F. App'x 327, 340 (4th Cir. 2013).

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult.  The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. . . .  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Id. at 340-41 (internal citations omitted).

11

Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Harrington, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 693, 687). In a capital case, "the prejudice inquiry centers on 'whether there is a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" Williams v. Ozmint, 494 F.3d 478, 484 (4th Cir. 2007) (quoting Strickland, 466 U.S. at 695 (alterations and ellipses in Ozmint)). If a petitioner does not satisfy one prong of the Strickland test, a court need not inquire whether petitioner has satisfied the other prong. Strickland, 466 U.S. at 697.

The Sixth Amendment right to the effective assistance of counsel exists "in order to protect the fundamental right to a fair trial." Id. at 64. "Thus, the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." Lockhart v. Fretwell, 506 U.S. 364, 369 (1993) (quoting United States v. Cronic, 466 U.S. 648, 658 (1984)).

## C. Applicability of 28 U.S.C. § 2254(d)

Morva argues that the deferential standard set forth in § 2254(d) should not apply in this case and his non-defaulted claims should be considered de novo "because the state court did not adjudicate them on the merits[.]" Second Am. Pet., Dkt. No. 111, at 20. Morva cites Winston v. Kelly, 592 F.3d 535, 555-56 (4th Cir. 2010), for the proposition that the Supreme Court of Virginia's disposition of the state habeas petition is not entitled to the deference proscribed in § 2254(d) because the Supreme Court of Virginia denied Morva's motions for discovery, for appointment of

12

mental health experts, and for an evidentiary hearing. Morva contends, therefore, that the court must review the claims de novo. Second Am. Pet., Dkt. No. 111, at 35.

"Whether a claim has been adjudicated on the merits is a case-specific inquiry," and de novo review might be appropriate if "a state court unreasonably refuses to permit further development of the facts of a claim[.]" Winston v. Pearson, 683 F.3d 489, 496 (4th Cir. 2012) (internal quotation marks omitted). Upon review of the voluminous record in this case, the court cannot conclude that the Supreme Court of Virginia unreasonably refused further factual development of the facts of any of Morva's claims. In addition to the seven volumes of the joint appendix considered on direct appeal, the Supreme Court of Virginia considered the five volumes of state habeas appendix materials Morva filed in connection with his initial state habeas petition along with the expert mental health assessments of Drs. Bender, Cohen, and Hagan found in volume six of the state habeas appendix. The first five volumes of the state habeas appendix span more than two thousand pages, and contain (1) fifty-nine affidavits from Morva's family, friends, acquaintances and others, (2) data regarding Morva's family history, (3) reports from police and first responders, (4) educational and employment records for Morva and his family, (5) medical records for Morva and his family, (6) military and jail records for Morva's brother Michael, and (7) Morva's jail records.

In connection with his state habeas petition, Morva sought discovery of additional information and the appointment of mental health experts. Morva asked the Supreme Court of Virginia to permit inspection or other discovery concerning the conditions of C-Block of the Montgomery County Jail where Morva was housed prior to the murders. The Supreme Court of Virginia did not permit the requested discovery and denied the claim, ruling that Morva's allegations concerning the living conditions at the Montgomery County Jail "would not have provided a viable

13

defense to the murders he committed, and would not have mitigated the murders."[13] <u>Morva v. Warden</u>, 285 Va. at 517, 741 S.E.2d at 787. Thus, additional discovery on the jail conditions was immaterial to the ultimate legal conclusion reached by the Supreme Court of Virginia.

Next, Morva sought discovery depositions from a few persons who would not voluntarily speak with state habeas counsel. Morva asked to question Commonwealth trial witness Jennifer Preston, a witness to the shooting of hospital security guard Derrick McFarland.[14] Morva sought to question Preston about her state of mind, suggesting that her "perception and judgment may well have been impaired at the time of the shooting." State Habeas Motion for Leave to Conduct Discovery, filed March 23, 2011, at 11. Morva speculates from Preston's prior criminal history that she may have been intoxicated, that her "accident may have involved the use of drugs or consumption of alcohol or some other nonexternal event." <u>Id.</u> at 12. Morva also posits that Preston may have been in shock or had been "administered medications or other treatment in the hospital, and these may have affected her perception and judgment." <u>Id.</u> Preston testified at Morva's trial and was cross examined. Nothing about her testimony suggests any lack of capacity on her part, and the discovery request is entirely speculative.

Morva likewise sought to depose Gregory Nelson, Stanford Harvey and Jeffrey Roberts, Morva's co-defendants on the pending burglary and robbery charges, concerning Morva's "increasingly bizarre behavior" and to "provide further proof of his delusions and aberrant

---

[13] Prior to the murders, Morva had been a pretrial detainee at the Montgomery County Jail since the summer of 2006 on charges of attempted burglary, conspiracy to commit burglary, burglary, attempted robbery, and use of a firearm.

[14] Preston was in a car accident the night before Morva's escape and was brought to the hospital for emergency treatment.

14

thoughts." Id. at 16-17. Morva argues that such information "would have helped the mental health experts reach an informed and accurate diagnosis." Id. at 17. As will be addressed in detail in connection with claim IX, Morva's mental health experts were well aware of his peculiarities,[15] and many witnesses testified in mitigation about his eccentric behavior around Blacksburg. Morva and his co-defendants faced prosecution for violent crimes, and it cannot be credibly maintained that calling them as trial witnesses could have helped Morva. Given "the totality of the evidence before the . . . jury," Strickland, 466 U.S. at 695, on mitigation, the failure to engage in additional discovery does not call into question the application of § 2254(d).

Nor can it be said that the ninth grade art and eleventh grade piano lab teachers from whom Morva sought discovery could offer relevant information that was not cumulative of the information already contained in the trial record or in the numerous affidavits from Morva's friends and acquaintances that filled Volume I of the state habeas appendix. Indeed, at trial, Morva called as witnesses another high school teacher and a guidance counselor, along with several friends.

Finally, Morva sought to depose Laura Eichenlaub, a counselor at the Montgomery County Jail who did an intake interview of Morva a few months after he was arrested on the robbery and burglary charges. Her interview notes indicate that Morva was stressed and wanted to talk with someone new. Her notes indicate that Morva's Behavior/Appearance, Thought Content/Process, Orientation, and Suicidal and Homicidal Ideation were "WNL," presumably meaning within normal limits. The form noted Morva's digestive issues (irritable bowel syndrome), poor sleep, and family

---

[15] Indeed, Dr. Cohen's report states that "[b]eginning in his mid-teenage years, [Morva] developed several intense preoccupations, primarily involving his physical functioning, his belief that he is fundamentally different from other people, his desire to lead an 'all-natural' lifestyle, and his distrust of others. He is extremely rigid with regard to his personal beliefs and he has difficulty seeing things from the point of view of others." SHA Vol. 6, at 2468-74. Dr. Cohen testified at trial as to his diagnosis that Morva suffered from a schizotypal personality disorder.

15

history of alcoholism. Eichenlaub's interview notes are, in short, cumulative of the volumes of information on these subjects otherwise contained in the trial record and state habeas appendix. Like many of the state habeas affiants, Eichenlaub had also run into Morva at downtown Blacksburg shops before his arrest. There is no suggestion that her observations would be anything other than cumulative of the trial record or the host of affidavits collected in the state habeas appendix.

In addition to this discovery, Morva asked the Supreme Court of Virginia to appoint additional mental health experts. State habeas counsel offered an affidavit from Dr. Dale Watson and an unsworn submission by Dr. Leslie Liebowitz, opining that a comprehensive mental health evaluation of Morva should be undertaken. Dr. Watson's affidavit was somewhat critical of the opinions rendered by the mental health experts who testified at trial, indicating that they did not have sufficient information to properly assess Morva's delusional beliefs. Appendix to Morva's Second Am. Pet., Dkt. No. 111-1, at 76-87. Dr. Liebowitz offered that Morva may have been exposed to childhood trauma and that he ought to be evaluated by a clinician with expertise in traumatic stress or child maltreatment. Id. at 107. However, neither Drs. Watson nor Liebowitz met Morva. Thus, neither was in a position to evaluate or diagnose Morva. As will be addressed in detail in connection with the court's discussion of claim IX, Morva had the assistance of two mental health professionals appointed by the circuit court to assist him at trial. Dr. Bender testified as to the results of psychological testing he performed on Morva, and Dr. Cohen testified as to his diagnosis of schizotypal personality disorder. The fact that other mental health experts, some years after the trial, suggest that further mental health evaluations be performed on Morva to see whether he suffered from different, even more severe, mental health issues did not change the constitutional calculus facing the Supreme Court of Virginia in claim IX. The question was not whether another

16

expert may disagree with the assessment provided to the jury by Drs. Bender and Cohen. Rather, the question was whether their assistance, and that of trial counsel working with them, met the constitutional standard. Morva had the assistance of well-qualified mental health experts at trial, and the court cannot fault the Supreme Court of Virginia for not reopening discovery to obtain a new mental health evaluation of Morva some years later.

To be sure, the Supreme Court of Virginia did not grant Morva's requests for additional discovery, appoint new mental health experts or conduct an evidentiary hearing. But state habeas counsel presented dozens of affidavits and reams of records which the Supreme Court of Virginia accepted and considered. "The fact that [Morva's] state post-conviction counsel requested but was denied an evidentiary hearing simply does not, without more, warrant <u>de novo</u> review of the state court's decision." <u>Burr v. Lassiter</u>, 513 F. App'x 327, 340 (4th Cir. 2013).

In short, there is no indication that Morva's discovery and other requests in the state habeas proceedings would have led to material evidence that could have in any respect altered the outcome of Morva's trial. Rather, the discovery sought by Morva is either speculative or cumulative of the testimony presented trial. Given the voluminous record in this case, the Supreme Court of Virginia did not act unreasonably in declining to permit the additional discovery sought by Morva, authorize a new mental health evaluation, or conduct an evidentiary hearing. As such, the court is required to review the state court's adjudication of Morva's claims under its disposition of the deferential standards of § 2254(d).

## IV.    **Analysis of Morva's Claims**

The court will address the substance of each of Morva's claims in turn, considering issues of procedural default in connection with claims II(A), IV and VIII(B).

17

## A. Claim I – Denial of Expert Testimony in Prison Risk Assessment

Morva argues in claim I that the circuit court violated the Eighth and Fourteenth Amendments when it denied Morva's motion to appoint Dr. Mark D. Cunningham, a prison-risk assessment expert, in mitigation of the prosecution's assertion of Morva's future dangerousness. The Supreme Court of Virginia described the relevant facts as follows:

> Prior to trial, Morva filed a motion for the appointment of an expert on prison risk assessment, Dr. Mark D. Cunningham. Although the court had already appointed two psychologists as mitigation experts, Morva argued that Dr. Cunningham would be needed to rebut the Commonwealth's claim that Morva was a future danger to society and to provide the jury with an assessment of the likelihood that Morva would commit violence if he were sentenced to life in prison. Along with the motion, Morva proffered Dr. Cunningham's curriculum vitae, an example of a presentation Dr. Cunningham had given in <u>Commonwealth v. Jose Rogers</u>, and a declaration from Dr. Cunningham regarding his qualifications and experience in providing violence risk assessments and his anticipated testimony.
>
> * * *
>
> Morva contended that "[b]ecause the only alternative to the death penalty for a defendant convicted of capital murder is life imprisonment without the possibility of parole, the only 'society' to which the defendant can ever pose a 'continuing serious threat' is prison society." Morva stated that he could not "effectively rebut assertions of 'future dangerousness' by the Commonwealth unless he [were] given the tools with which to inform the jury how to make reliable assessments of the likelihood of serious violence by an individual defendant in [a] prison setting – including security and the actual prevalence of serious violence" in a prison setting, which Dr. Cunningham's testimony would provide.
>
> Acknowledging Virginia precedent to the contrary, Morva also argued, in the motion, that this Court's future dangerousness precedent misinterprets the controlling requirements of federal constitutional law by rejecting evidence concerning the conditions and procedures governing a defendant's future confinement. Citing <u>Simmons v. South Carolina</u>, 512 U.S. 154 (1994), <u>Skipper v. South Carolina</u>, 476 U.S. 1 (1986), and <u>Gardner v. Florida</u>, 430 U.S. 349 (1977), Morva's motion claimed that a defendant has a constitutional

18

right to rebut any evidence upon which the jury might rely in sentencing him to death and that this constitutional right requires appointment of an expert on prison risk assessment and "admission of [a] foundation about such critical considerations as the defendant's future classification if sentenced to life imprisonment; the limitations on his freedom within the prison system; the Virginia Department of Corrections internal safety and security measures; and the actual rates of serious violence in Virginia's prisons."

In Dr. Cunningham's declaration, provided as an attachment to the motion, Dr. Cunningham stated, "A reliable individualized assessment can be made of the likelihood that Mr. Morva will commit acts of serious violence if confined for life in the Virginia Department of Corrections." He further acknowledged that he would testify concerning "[g]roup statistical data (i.e., base rate data)" because the "rates of violence in similarly situated groups is critically important to a reliable violence risk assessment and forms the anchoring point of any individualized risk assessment." If appointed, he would testify that "[r]isk is always a function of context," and consideration of interventions that can be brought to bear on inmates in the Virginia Department of Corrections would be an important part of the violence risk assessment he would perform. He would also testify that "[t]here are conditions of confinement available in the Virginia Department of Corrections that substantially negate the potential/occurrence of serious violence" and that "[s]hould Mr. Morva be identified as a disproportionate risk of violent or disruptive conduct by the Virginia Department of Corrections, super-maximum confinement could be brought to bear."

Dr. Cunningham further stated "it is necessary to specify the conditions of confinement in order to make a reliable violence risk assessment and to address the implicit inference of the Commonwealth in alleging [a] continuing threat that it is incompetent to securely confine the defendant in the future." He noted that he would testify that "[u]nder an administrative maximum level of confinement at Red Onion or other ultra-high security unit, an inmate is single-celled and locked down twenty-three hours daily, with individual or small group exercise, and shackled movement under escort. Under such conditions of security, opportunities for serious violence toward others are greatly reduced." He opined that "[s]uch increased security measures would act to significantly reduce the likelihood of Mr. Morva engaging in serious violence in prison."

19

In the letter from Dr. Cunningham accompanying the motion to reconsider, Dr. Cunningham stated that group statistical data regarding similarly situated inmates interpreted in light of characteristics specific to Morva is relevant to future prison conduct. He also expounded upon the scientific validity of making individual assessments based upon group data. He reiterated that risk is always a function of context or preventative interventions and that increased security measures could significantly reduce the likelihood that Morva would engage in serious violence in prison. He opined that informing the jury of the capabilities of the Virginia Department of Corrections to bring higher levels of security to bear was necessary to provide an individualized risk assessment.

\* \* \*

Morva points out that, in this case, Dr. Cunningham has proposed to factor into his statistical analysis individualized characteristics that have been shown to reduce the likelihood of future violent behavior in prison, including Morva's prior behavior while incarcerated, age, level of educational attainment, and appraisals of his security requirements during prior incarceration. Due to the integration of these factors into the analysis, Morva claims that Dr. Cunningham's testimony would have been "individualized" to Morva rather than simply a generalization applicable to any convicted murderer.

\* \* \*

. . . [T]he Commonwealth in this case neither proposed nor introduced any evidence concerning Morva's prospective life in prison, but limited its evidence on the future dangerousness aggravating factor to the statutory requirements consisting of Morva's prior history and the circumstances surrounding the offense. Thus, Dr. Cunningham's anticipated testimony was not in rebuttal to any specific evidence concerning prison life.

Morva v. Commonwealth, 278 Va. at 337, 345-47, 683 S.E.2d at 557-58, 562-64 (internal citations

omitted).

Despite Morva's arguments to the contrary, the trial record reflects that the Supreme Court

of Virginia's determination of the facts was not unreasonable. On July 16, 2007, trial counsel moved

the circuit court to appoint Dr. Cunningham as an expert to provide evidence in mitigation of the

Commonwealth's expected assertion of Morva's future dangerousness, citing Gardner, Skipper,

20

Simmons, Ake v. Oklahoma, 470 U.S. 68 (1985), and Husske v. Commonwealth, 252 Va. 203, 476 S.E.2d 920 (1996). On August 1, 2007, the circuit court denied the motion to appoint Dr. Cunningham, citing Burns v. Commonwealth, 261 Va. 307, 340, 541 S.E.2d 872, 893 (2001), which held that a convict's death sentence must be based on the convict's history and background and the circumstances of the capital offense, instead of the general nature of prison life in a maximum security facility. On February 1, 2008, trial counsel asked the circuit court to reconsider the denial and submitted three documents in support: Dr. Cunningham's declaration; his updated curriculum vitae; and sample presentation slides that describe generally Dr. Cunningham's anticipated expert testimony.

Dr. Cunningham stated in his declaration that:

> A reliable individualized assessment can be made of the likelihood that Mr. Morva will commit acts of serious violence if confined for life in the Virginia Department of Corrections. In the absence of the [circuit] [c]ourt appointing me to provide this risk assessment, with associated review of records and interview of Mr. Morva, the precise contours of this testimony cannot be specified. However, the reliable methodology and associated group statistical data that would have been applied in making this risk assessment can be detailed. Further, even generalized information on the methodology, rates, and correlates of violence risk assessment for prison that is particularized by hypothetical questions can be crucial to a capital jury making this determination in a reliable and scientifically-informed fashion.

Direct Appeal JA at 663-64. The materials provided by Dr. Cunningham support the reasonableness of the Supreme Court of Virginia's conclusion that Dr. Cunningham's opinion as to Morva's future dangerousness was not based on an individualized assessment of Morva but rather on criminal justice statistics of inmates in various states over the course of several decades.

As reflected in his presentation slides, Dr. Cunningham employed a methodology that compared a defendant's age to the correlation between the ages of offenders in New York and the

21

likelihood those offenders committed an infraction of facility rules in the 1970s. Dr. Cunningham also compared a sample defendant's age to the federal Bureau of Prisons' data from 1989 and then summarized the narrative data of the sample defendant's adjustment to incarceration in various Virginia facilities. Dr. Cunningham next summarized his findings from a study of corrections in Florida that concluded inmates sentenced to life without parole were significantly less likely to be involved in assaultive conduct than inmates sentenced to less than twenty years' incarceration. Dr. Cunningham looked at other sources, including data from the Virginia Department of Corrections, to support his proposition that past violence in the community, escape history, charges, and convictions are not good predictors of a capital inmate's conduct in prison. The sample presentation slides concluded by stating that Virginia's correctional programming and security measures could reduce the risk that any capital inmate could commit assaultive conduct. The contours of Dr. Cunningham's thesis are apparent: a capital inmate, whether it be Morva or someone else, will not likely be an increased risk to institutional security because many capital convicts, although not all, did not attack inmates or staff while incarcerated and because the Virginia Department of Corrections can keep capital inmates in long-term segregation for life.

The Supreme Court of Virginia denied the claim on direct appeal, finding no error in the circuit court's refusal to appoint Dr. Cunningham. The Supreme Court of Virginia recognized that due process requires a capital defendant be allowed the opportunity to rebut information that a jury could consider, and may have relied upon, when recommending a death sentence. Morva v. Commonwealth, 278 Va. at 348, 683 S.E.2d at 564. Although the Supreme Court of Virginia recognized that "Dr. Cunningham proposed to provide testimony that concerns Morva's history and background, prior behavior while incarcerated, age and educational attainment, and such factors

22

might bear on his adjustment to prison[,]" it determined that Dr. Cunningham's expected testimony about the rates of assaults and prison security conditions "were not relevant to the determination the jury has to make concerning Morva's future dangerousness." Id. at 350, 683 S.E.2d at 565. The Supreme Court of Virginia did not consider Dr. Cunningham's description of correctional programming and security measures to be unique to Morva as the conditions would be "true of any other inmate as well, and it is evidence of the effectiveness of general prison security[.]" Id. at 351, 683 S.E.2d at 565. Thus, the Supreme Court of Virginia concluded that the circuit court did not err because Dr. Cunningham's proposed testimony was not relevant or probative as to Morva's future dangerousness and that a fundamentally unfair trial did not occur without that testimony. Id. at 351, 683 S.E.2d at 566. Concluding that Dr. Cunningham's opinion was founded on statistics derived from generalized prison studies and was not grounded in Morva's character, record or the circumstances of the offense, the Supreme Court of Virginia found no error in the circuit court's exclusion of this evidence as irrelevant to the issue of Morva's future dangerousness.

In rejecting Morva's argument that the circuit court's refusal to appoint Dr. Cunningham violated due process, the Supreme Court of Virginia addressed three United States Supreme Court decisions: Gardner, Skipper, and Simmons. Consistent with the Supreme Court of Virginia's conclusion, none of those cases constitutionally required admission of Dr. Cunningham's opinion.

In Gardner, the United States Supreme Court found a due process violation when a defendant was sentenced to death based, at least in part, on confidential information contained in a presentence report, which he had no opportunity to explain. The Court first "acknowledged its obligation to re-examine capital-sentencing procedures against evolving standards of procedural fairness in a civilized society." 430 U.S. at 357. The Gardner Court reaffirmed that "death is a

23

different kind of punishment from any other that may be imposed in this country[,]" and that the sentencing process must comply with the Due Process Clause. Id. at 357-58. The Court rejected the state of Florida's arguments that concerns over confidentiality of sources of information for the presentence report, delays associated with disclosure, and the proper exercise of discretion by trial judges warranted nondisclosure. "We conclude that petitioner was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." Id. at 362.

Ronald Skipper was convicted of capital murder and rape in South Carolina. Skipper sought to introduce testimony from two jailers and a regular visitor about how he had made a good adjustment to prison, which the state trial court found to be irrelevant and inadmissible. The state trial court said his adjustment was not an issue in the case. During closing argument, the prosecution argued that Skipper would pose disciplinary problems if sentenced to prison and would likely rape other prisoners. Skipper argued that the excluded evidence was relevant mitigating evidence and it was constitutional error not to allow it under Lockett v. Ohio, 438 U.S. 586 (1978), and Eddings v. Oklahoma, 455 U.S. 104 (1982). The Court framed the issue as "whether the exclusion from the sentencing hearing of the testimony petitioner proffered regarding his good behavior during the over seven months he spent in jail awaiting trial deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment." Skipper, 476 U.S. at 4.

The Court answered the question in no uncertain terms:

> It can hardly be disputed that it did. The State does not contest that the witnesses petitioner attempted to place on the stand would have testified that petitioner had been a well-behaved and well-adjusted prisoner, nor does the State dispute that the jury could have drawn favorable inferences from this testimony regarding petitioner's character and his probable future conduct if sentenced to life in

24

prison. Although it is true that any such inferences would not relate specifically to petitioner's culpability for the crime he committed, see Koon I, supra, 278 S.C. at 536, 298 S.E.2d at 774, there is no question but that such inferences would be "mitigating" in the sense that they might serve "as a basis for a sentence less than death." Lockett, supra, 438 U.S. at 604. Consideration of a defendant's past conduct as indicative of his probable future behavior is an inevitable and not undesirable element of criminal sentencing: "any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose." Jurek v. Texas, 428 U.S. 262, 275. The Court has therefore held that evidence that a defendant would in the future pose a danger to the community if he were not executed may be treated as establishing an "aggravating factor" for purposes of capital sentencing, Jurek v. Texas, supra; see also Barefoot v. Estelle, 463 U.S. 880 (1983). Likewise, evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating. Under Eddings, such evidence may not be excluded from the sentencer's consideration.

476 U.S. at 4-5 (parenthetical omitted).

In footnote 1, the Court noted the relevance of the evidence of Skipper's past good behavior in prison in light of the prosecution's closing argument that Skipper would pose problems in jail, including rape.

The relevance of evidence of probable future conduct in prison as a factor in aggravation or mitigation of an offense is underscored in this particular case by the prosecutor's closing argument, which urged the jury to return a sentence of death in part because petitioner could not be trusted to behave if he were simply returned to prison. Where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only the rule of Lockett and Eddings that requires that the defendant be afforded an opportunity to introduce evidence on this point; it is also the elemental due process requirement that a defendant not be sentenced to death "on the basis of information which he had no opportunity to deny or explain." Gardner v. Florida, 430 U.S. 349, 362 (1977).

476 U.S. at 5 n.1.

25

Jonathan Simmons beat an elderly woman to death and received a death sentence after trial. During closing argument, the prosecution argued that Simmons' future dangerousness was a factor for the jury to consider when fixing an appropriate punishment. Simmons argued that there was no reason to expect future acts of violence from him in a prison setting. Simmons sought to offer evidence of his ineligibility for parole and an instruction that if sentenced to life imprisonment that he would not be paroled. The trial court refused the proposed instruction. During deliberations, the jury asked a question about parole, and the trial court instructed the jury that they were not to consider parole or parole eligibility. Twenty-five minutes later, the jury returned the death sentence.

Citing Gardner, the Simmons Court noted that the Due Process Clause does not allow the execution of a person on the basis of information which he had no opportunity to deny or explain. The Court noted that the jury may well have misunderstood that Simmons could be released on parole if sentenced to life imprisonment. "The State thus succeeded in securing a death sentence on the ground, at least in part, of petitioner's future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its noncapital sentencing alternative, namely, that life imprisonment meant life without parole. We think it is clear that the State denied petitioner due process." Simmons, 512 U.S. at 162. The Court continued:

> In assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant. Holding all other factors constant, it is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not. Indeed, there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole. The trial court's refusal to apprise the jury of information so crucial to its sentencing determination, particularly when the prosecution alluded to the defendant's future dangerousness in its argument to the jury, cannot be reconciled with our well-established precedents interpreting the Due Process Clause.

26

Id. at 163-64.  The Court continued:

> Like the defendants in <u>Skipper</u> and <u>Gardner</u>, petitioner was
> prevented from rebutting information that the sentencing authority
> considered, and upon which it may have relied, in imposing the
> sentence of death.  The State raised the specter of petitioner's future
> dangerousness generally, but then thwarted all efforts by petitioner to
> demonstrate that, contrary to the prosecutor's intimations, he never
> would be released on parole and thus, in his view, would not pose a
> future danger to society.  The logic and effectiveness of petitioner's
> argument naturally depended on the fact that he was legally ineligible
> for parole and thus would remain in prison if afforded a life sentence.
> Petitioner's efforts to focus the jury's attention on the question
> whether, in prison, he would be a future danger were futile, as he
> repeatedly was denied any opportunity to inform the jury that he
> never would be released on parole.  The jury was left to speculate
> about petitioner's parole eligibility when evaluating petitioner's future
> dangerousness, and was denied a straight answer about petitioner's
> parole eligibility even when it was requested.

Id. at 165-66 (footnote omitted).  The Court concluded:

> But if the State rests its case for imposing the death penalty at least in
> part on the premise that the defendant will be dangerous in the
> future, the fact that the alternative sentence to death is life without
> parole will necessarily undercut the State's argument regarding the
> threat the defendant poses to society.  Because truthful information
> of parole ineligibility allows the defendant to "deny or explain" the
> showing of future dangerousness, due process plainly requires that he
> be allowed to bring it to the jury's attention by way of argument by
> defense counsel or an instruction from the court.

Id. at 168-69.

To be sure, Morva's prosecutors argued future dangerousness in support of the death

penalty.  However, Morva's trial did not contain the constitutional infirmities present in <u>Gardner</u>,

<u>Skipper</u> or <u>Simmons</u>.  First, unlike in <u>Gardner</u>, Morva was not sentenced based on confidential

information he had no opportunity to rebut.  Second, unlike in <u>Skipper</u>, Morva introduced

27

testimony from a jailer as to his good behavior while on pretrial detention. Third, unlike in Simmons, the circuit court told the jury that life imprisonment meant imprisonment without parole.

Nonetheless, Morva argues that the circuit court placed an unconstitutional limitation on his ability to present mitigation evidence by not appointing Dr. Cunningham as an expert witness. Viewed through the lens of § 2254(d), Morva's argument does not require issuance of the writ as to claim I.

Morva's argument that the Supreme Court of Virginia's ruling runs afoul of the holding in Skipper ignores the salient differences in the evidence presented in his case and in Skipper. Unlike in Skipper, Morva was allowed to present evidence as to his future dangerousness based on how he had behaved in pretrial confinement. In particular, during the sentencing phase of trial, Morva introduced the testimony of Captain Norine Pilkins from the New River Valley Regional Jail. Captain Pilkins testified that Morva had been held at the New River Valley Regional Jail since August 21, 2006 and that he had caused no problems, noting that he was in isolation and locked down 23 hours a day. Thus, the very evidence excluded in Skipper – testimony from a prison guard as to pretrial behavior – was admitted at Morva's trial. As such, the Supreme Court of Virginia's decision was not "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Given the fact that the jury heard Captain Pilkins' testimony that Morva posed no problems in the New River Valley Regional Jail during the more than one year period that he was held there in pretrial detention, Morva's trial does not run afoul of Skipper. There is no United States Supreme Court decision holding that due process requires expert evidence on a capital defendant's future dangerousness while in prison based on statistical evidence, rather than the "defendant's character or

28

record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604. As such, Morva's argument does not cross the § 2254(d) threshold.

The determination by the Supreme Court of Virginia that due process did not require the appointment of Dr. Cunningham or the admission of his expert opinion was not unreasonable, either factually or legally. As another court considering the proposed testimony of Dr. Cunningham concluded, "[p]ermitting his generalized testimony about prison crime would simply confuse and mislead the jury and invite a decision on an impermissible basis . . . . Dr. Cunningham's testimony about the capability of the Bureau of Prisons to secure inmates is not relevant to any issues in this case." United States v. Taylor, 583 F. Supp. 2d 923, 941 (E.D. Tenn. 2008). The Taylor court continued:

> Lastly, because Dr. Cunningham's disallowed testimony could be given verbatim in any capital case in the country without changing a single word, it runs afoul of what the Supreme Court said should be the foundation of capital sentencing: an individualized inquiry. Jones v. United States, 527 U.S. 373, 381 (1999). Testimony regarding hundreds or thousands of prisoners in groups, in many unidentified prisons, in circumstances that the jury could never know precisely, would run the risk of the jury losing sight of its obligation to focus on the individual before it, the defendant, his character or record, and the circumstances of the offenses. Individualized sentencing of a capital defendant is one of the most important decisions the jurors will ever make in their own lives and testimony regarding generalities of prison invites the jury to make decisions based upon group characteristics and assumptions. This presentation, as the Seventh Circuit said in Johnson, could be directed to Congress to convince it there is no need for the death penalty, rather than to a jury.

583 F. Supp. 2d at 942-43 (footnote omitted) (citing United States v. Johnson, 223 F.3d 665, 674-75 (7th Cir. 2000), cert. denied, 534 U.S. 829 (2001)).

29

Finally, Morva argues that the circuit court's refusal to appoint Dr. Cunningham was particularly unfair and violative of due process because the prosecution, much like in Skipper, argued in closing that Morva would pose a danger to prison guards.[16] Morva's argument, while superficially appealing, ignores the reality of the closing arguments given at trial.

Unlike in Skipper, the trial record in this case establishes that the issue of Morva's future dangerousness in prison was raised first by trial counsel, not the prosecution. During closing argument at the sentencing phase, the prosecution addressed Morva's future dangerousness by focusing on Morva's prior history and the circumstances surrounding the offenses, not his future behavior in prison. The prosecution argued:

> Defendant is a future danger to society . . . . [H]e is both extremely intelligent and also extremely violent . . . . [T]he Defendant has shown you what he is capable of in the future . . . . with his actions. The Defendant has shown you the damage that he can do to a man[,] [t]he damage that he can do to a man with his bare hands, the damage that he can do to a man with a piece of metal in his hand, and the damage that he can do to a man when he gets a hold of a gun . . . . [H]e has shown you his future dangerousness, and he has shown it to you in abundance.

Direct Appeal JA at 2413, 2418. The prosecution did not address Morva's future dangerousness in a prison setting in its initial closing argument.

In their closing argument, Morva's trial counsel focused on the fact that Morva, imprisoned for life without the possibility of parole, posed no future threat. This argument was tethered to

---

[16] The Supreme Court of Virginia noted that the prosecution did not introduce any evidence at the sentencing phase that Morva would pose a risk of future dangerousness inside the prison. "[T]he Commonwealth in this case neither proposed nor introduced any evidence concerning Morva's prospective life in prison, but limited its evidence on the future dangerousness aggravating factor to the statutory requirements consisting of Morva's prior history and the circumstances surrounding the offense. Thus, Dr. Cunningham's anticipated testimony was not in rebuttal to any specific evidence concerning prison life." 278 Va. at 347, 683 S.E.2d at 563-64 (internal citations omitted). While that is accurate, the issue of Morva's future dangerousness inside prison was addressed by both sides during closing argument.

Captain Pilkins' testimony that Morva posed no danger during his pretrial confinement at the New River Valley Regional Jail after the murders. As such, trial counsel argued that the jury should impose a life sentence because Morva would not pose a danger to anyone if confined in a secure state penitentiary.

> [T]he evidence in this case is Mr. Morva's society is in the penitentiary with life without the possibility of parole. His society is within that guarded setting . . . . where he will never ever again have an opportunity to commit the acts for which you have found him guilty. And, ladies and gentlemen, I submit to you that alone is sufficient to find the Commonwealth has failed to prove beyond a reasonable doubt Mr. Morva is a danger to the future . . . . I ask you respectfully to consider that Mr. Morva will never ever have the opportunity to escape . . . . [H]is society . . . will be state penitentiary system [sic] with security levels that will not allow him to escape.

Direct Appeal JA at 2422-23, 2437.

In rebuttal closing argument, the prosecution addressed trial counsel's future dangerousness argument, focusing on Captain Pilkins' testimony that Morva was "always thinking" and that the jury should not ignore the possibility that Morva would escape again and pose a danger to the community, along with the danger he posed to prison guards. The prosecutor explained:

> Number one, the law says future danger, probability of violence to society, it doesn't specify to the Defendant's particular society, it doesn't specify to prison. So to even get to [trial counsel]'s theory, you've got to first conclude that Defendant will never escape again. And I submit to you, it is impossible for you to conclude that. We heard about, from Captain Pilkins, and Captain Pilkins said he is always thinking. He's smart, he's smarter than the others, and he is always thinking. We'll talk more about that, but you first cannot reach that conclusion that [trial counsel] is asking you to reach, until you are satisfied that he will never escape again. And I submit to you, you can't be satisfied of that. Number two, just as importantly, that argument fails to consider the safety and security of guards. We're talking about a prisoner here who hates the police. We're talking about a prisoner here who hurts guards, beats them. We're talking about a prisoner who shoots uniformed officers. Those

31

people are entitled to protection in the world too. Jail guards, prison guards. They are part of society, and they are at risk from that Defendant without a doubt. You need look no further than his actions and his words to know that those guards are at risk . . . . [H]e wanted to hurt officers . . . . He wanted to hurt people . . . that represented the law, people that represented the jail. The people that were confining him and taking away his freedom . . . . So society is everybody . . . . and it certainly is those jail guards, and those prison guards . . . . [Trial counsel] told you repeatedly that life in prison . . . would be the ultimate punishment. I want you to consider a very important fact, and a very chilling fact, and that is one month after that Defendant was placed in jail, he started talking, writing to his own mother about murdering jail guards. One month. It took one month of jail, one month of county jail, to get this Defendant ready to kill a guard. He wrote to his mother, ["]I will kick an unarmed guard in the throat and then I will stomp him until he is as dead as I'll be.["] That shows you what's in his heart, it shows you what's in his mind, it shows you a hatred of guards . . . . I would submit to you that in only one year he carried that out . . . . I submit to you, a prospect of life in prison is very frightening. If one month causes you to develop the heart and the mind to kill a jail guard, in one year and it's done, and you're killing people, what is the prospect of life in prison going to cause that person to feel justified in doing to those prison guards?

Direct Appeal JA at 2441-44.

The Supreme Court of Virginia did not unreasonably apply federal law when dismissing this claim. Although it certainly could have presented the same argument in its initial closing argument, the Commonwealth discussed Morva's future dangerousness in a correctional setting only in rebuttal. As Morva raised the issue first in closing argument, the unfairness noted by the Court in Skipper and Gardner did not occur. Unlike in Skipper, Morva was able to introduce evidence directly relevant to his behavior in prison, and both sides fashioned jury arguments based on evidence as to Morva's actual behavior in prison, as opposed to Dr. Cunningham's "statistical speculation." See Porter v. Commonwealth, 276 Va. 203, 255, 661 S.E.2d 415, 442 (2008) (describing Dr. Cunningham's proffer in another capital case as "statistical speculation").

32

In short, the evidence excluded in Skipper was admitted here, and trial counsel were able to argue to the jury that Morva would not pose a risk inside prison based on his own historic behavior. Skipper does not require admission of expert testimony on the issue of future dangerousness based on statistical data rather than evidence concerning Morva's character, record, or circumstances of the offense, and the specific arguments made at trial do not suggest that Morva was denied the opportunity to rebut the prosecution's arguments or otherwise was denied due process. Because the Supreme Court of Virginia's determination of claim I was not contrary to or an unreasonable application of federal law, claim I must be dismissed.[17]

---

[17] The court, however, will issue a certificate of appealability as to claim I for the following reasons.

Although the majority of the Justices of the Supreme Court of Virginia rejected claim I on Morva's direct appeal, Justice Koontz and Justice Keenan dissented. Writing for himself and Justice Keenan, Justice Koontz perceived the majority's decision as "effectively adopt[ing] a per se rule that expert prison risk assessments are inadmissible to rebut evidence of future dangerousness in a capital murder case." Morva v. Commonwealth, 278 Va. at 355, 683 S.E.2d at 568. In addition to this broader concern, the dissenting Justices believed the denial of Dr. Cunningham's appointment resulted in "fundamentally unfair" death sentences. Id. at 356, 683 S.E.2d at 568. The dissent concluded:

> [C]ivilized society does not consider the protection of due process rights to a fair trial as so fickle a concept that a defendant convicted of a capital offense should be subjected to a death penalty where it can be reasonably debated that a requested expert's prison risk assessment is sufficiently "particularized" to the defendant. Such a risk assessment would afford the defendant the means to assist the jury in its determination whether a life sentence without the possibility of parole, rather than a death sentence, would be the appropriate penalty for the crimes committed by the defendant.

Id. at 365, 683 S.E.2d at 574 (Koontz, J., dissenting).

The court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts. The standard for a certificate of appealability requires the applicant to make a substantial showing of the denial of a federal constitutional right. See Slack v. McDaniel, 529 U.S. 473, 483-84 (2000). To make a substantial showing, a party must demonstrate that the issues are subject to debate among jurists of reason, that a court could resolve the issues in a different manner, or that the questions presented are worthy of encouragement to proceed further. See id. The severity of the penalty may be considered in making this decision, and any doubt about whether to grant a certificate of appealability should be resolved in favor of the movant. Longworth v. Ozmint, 302 F. Supp. 2d 569, 571 (D.S.C. 2003) (citing Clark v. Johnson, 202 F.3d 760, 764 (5th Cir. 2000)).

In light of the dissent lodged by Justice Koontz and Justice Keenan and the majority's disposition of claim I, the court finds that reasonable jurists could debate whether claim I should be resolved in a different manner or that the issues

33

## B. Claim II – Trial Restraints

In claim II, Morva raises two issues regarding the restraints he wore under his clothes during the trial. Morva argues in claim II(A) that due process was violated because the jury allegedly saw Morva wearing visible restraints during trial. In claim II(B), Morva alleges that trial counsel were ineffective for not objecting to Morva's restraints.

The Supreme Court of Virginia dismissed claim II(A) on habeas review pursuant to Slayton v. Parrigan, 215 Va. 27, 29, 205 S.E.2d 680, 682 (1974), which precludes a Virginia court from reviewing a non-jurisdictional claim in a petition for a writ of habeas corpus when that claim could have been presented at trial and on appeal but was not. Morva v. Warden, 285 Va. at 513, 741 S.E.2d at 784. Slayton has been considered to be an independent and adequate state procedural ground for denying relief. See, e.g., Fisher v. Angelone, 163 F.3d 835, 844 (4th Cir. 1998). Although the Supreme Court of Virginia's reliance on Slayton is usually sufficient to foreclose federal review, a petitioner may show that Slayton is not "adequate" when it is "exorbitantly applied to the circumstances at issue[.]" Hedrick, 443 F.3d at 360 (citing Lee v. Kemna, 534 U.S. 362, 376 (2002)).

Morva argues that claim II(A) should not be considered procedurally defaulted via Slayton because the Supreme Court of Virginia's disposition of claim II(A) is "inherently contradictory" to its disposition of claim II(B). Specifically, Morva argues that Slayton is only properly applied when "counsel or petitioner knew or should have known of the complained of conduct at a time when the trial court could address" the issue. Lenz v. Warden of Sussex I State Prison, 267 Va. 318, 326, 593 S.E.2d 292, 296 (2004). Because the Supreme Court of Virginia found that there was "no evidence

---

presented in claim I are "adequate to deserve encouragement to proceed further." Accordingly, a certificate of appealability is granted for claim I.

to suggest Morva's [trial] counsel was or should have been aware any juror had learned" that Morva was wearing a stun belt beneath his clothes, Morva v. Warden, 285 Va. at 541, 741 S.E.2d at 785, Morva argues that Slayton cannot operate to bar his due process claim. In essence, Morva faults the Supreme Court of Virginia for not addressing his due process claim (claim II(A)) because counsel did not raise it at trial or on direct appeal, while at the same time denying his ineffective assistance claim (claim II(B)), finding that there was no reason for counsel to have been aware that certain jurors may have surmised that Morva was wearing restraints under his clothing.

Morva's argument ignores the procedural posture of the claims on habeas review at the Supreme Court of Virginia. Claim II(A), when presented in the state habeas petition, alleged that Morva's restraints were visible, which was a fact required to be accepted as true by the Supreme Court of Virginia. If Morva's restraints were truly visible, as alleged, then trial counsel, who sat next to, looked at, and interacted with Morva, could have seen the allegedly visible restraints and could have objected to the allegedly visible restraints at any time during trial. Because trial counsel could have seen the allegedly visible restraints and would have had "a fair and full opportunity to raise and have adjudicated the question . . . in his trial and upon appeal[,]" Slayton could properly bar the later presentation of this "visible restraints" due process claim on habeas review. Slayton, 215 Va. at 29, 205 S.E.2d at 682.

However, the ineffective assistance of counsel claim regarding the alleged visible restraints could not be raised on appeal and, thus, is not barred by Slayton. See, e.g., Sigmon v. Dir. of the Dep't of Corr., 285 Va. 526, 533, 739 S.E.2d 905, 908 (2013) ("[C]laims of ineffective assistance of counsel are not reviewable on direct appeal and thus can be raised only in a habeas corpus proceeding."). When adjudicating this claim on the merits, the Supreme Court of Virginia made

35

findings of fact that, despite Morva's allegations, none of his restraints were actually visible. "Because Morva was not visibly restrained in the presence of the jury and because there is no evidence that counsel was or should have been aware that jurors had learned Morva was wearing a stun belt under his clothing, trial counsel's failure to object to the restraints or stun belt placed on Morva was not deficient performance."  Morva v. Warden, 285 Va. at 514, 741 S.E.2d at 785.

In light of the record and the deference afforded to the Supreme Court of Virginia's application of Slayton, the court does not find the Supreme Court of Virginia's disposition of claims II(A) and II(B) to be inherently contradictory or that Slayton was exorbitantly applied to claim II(A). In applying Slayton to claim II(A), the Supreme Court of Virginia accepted as true Morva's assertion that his trial restraints were "visible," and properly found that claim to have been defaulted. Considering claim II(B) on the merits, the Supreme Court of Virginia made its own factual findings as to claim II(B) and found that there was no merit to Morva's claim that trial counsel were ineffective for not objecting to restraints which were, in fact, not visible to the jury.

Because the Supreme Court of Virginia's resolution of claims II(A) and II(B) rested on different factual underpinnings, with the allegations accepted as true for claim II(A) and with its separate factual findings as to claim II(B), the Supreme Court of Virginia's resolution of the two claims was not inconsistent.  Because the Slayton inquiry of claim II(A), founded as it was on the facts alleged in claim II(A), could be resolved without reference to the Supreme Court of Virginia's factual findings on the merits of claim II(B), the dispositions of these claims are not contradictory, and Slayton was not exorbitantly applied.  Accordingly, claim II(A) is procedurally defaulted, and the court must determine whether there is a basis to excuse this procedural default.

36

To excuse the procedural default of claim II(A), Morva argues in claim II(B) that trial counsel rendered ineffective assistance by not objecting to the jurors seeing Morva's restraints. The Supreme Court of Virginia resolved the merits of claim II(B) on habeas review, finding trial counsel did not render ineffective assistance in violation of the Sixth Amendment. Because the court concludes that Morva cannot establish deficient performance and prejudice for claim II(B), he fails to establish cause and prejudice to excuse the procedural default of claim II(A). Accordingly, claim II(A) must be dismissed as procedurally defaulted.

Claim II(B) concerns whether trial counsel were ineffective for failing to object at trial concerning Morva's restraints. It is undisputed that Morva did not wear leg shackles or handcuffs in the courtroom. Rather, Morva wore a stun belt under his shirt and a leg-stiffening device under his pants leg, making it difficult to kick or run. Morva argues that the restraints were visible to the jury, undermining the presumption of innocence and supporting the prosecution's position that Morva was a danger to society.

The Supreme Court of Virginia dismissed this claim on habeas review, finding that Morva was not prejudiced because the restraints were not visible to the jury and did not undermine the right to a fair trial. Because Morva did not suggest how trial counsel could have been aware during trial that some jurors may have surmised Morva wore a stun belt under his shirt, the Supreme Court of Virginia also determined that Morva failed to show that trial counsel performed deficiently.

The Supreme Court of Virginia's adjudication of this claim was not based on an unreasonable determination of the facts. Morva alleges that three affidavits filed in support of the state habeas petition established that jurors saw Morva wearing a stun belt and leg shackles. For example, the affidavit of Aditi Goel stated that she interviewed jurors following the trial in

37

connection with the Capital Post-Conviction Clinic at the University of Virginia School of Law. Goel's affidavit states that she interviewed juror Richard M. Bouck, Sr., and that he stated that he saw a security belt around Morva's waist. SHA Vol. 1, at 2, ¶ 12. David Chamberlain, another law student, averred that he interviewed juror Virginia Blevins, now Virginia Linkous. Chamberlain's affidavit states that Juror Linkous could see shackles on Morva's legs under counsel table. SHA Vol. 1, at 66, ¶ 9. Madeline Gibson, an employee of the Virginia Capital Representation Resource Center, interviewed juror Deborah Corvin. The Gibson affidavit states that Corvin noticed Morva wearing shackles and had a hard time walking with them on. SHA Vol. 1, at 264, ¶ 13. Despite the assertions in these affidavits executed by persons interviewing the jurors, each of the three jurors interviewed, Bouck, Linkous, and Corvin, executed subsequent affidavits themselves, explaining that the statements attributed to them by the interviewers were incorrect. Bouck averred, "I did not tell Morva's representatives that I saw a security belt around Morva's waist. I think I became aware at some point during the trial that he was wearing a security belt, but it was concealed from view under his clothes." Warden's Motion to Dismiss State Habeas Pet., Ex. 1, ¶ 6. Juror Linkous averred, "Mr. Morva appeared in street clothes and was neat and clean. I did not tell Morva's representatives that Morva had chains on his legs. Morva's representatives asked whether he was wearing leg chains, and I told them I had no recollection of whether Morva wore leg chains or not. I did not look at his feet." Id. at Ex. 4, ¶¶ 5, 8. Juror Corvin averred, "I did not tell Morva's counsel that I saw Morva walk to his seat in the courtroom. Morva was always present at counsel table when the jury was brought into the courtroom. I did not tell Morva's counsel that Morva was shackled, and I specifically told them I did not remember seeing shackles." Id. at Ex. 5, ¶¶ 3, 8-9, 13.

38

State habeas counsel also filed three affidavits from jurors on the issue of his restraints. Juror James "David" Calloway stated, "[T]wo officers sat behind Mr. Morva throughout the trial. They always looked like they were watching Mr. Morva and they sat or stood in a way that made them look prepared to react if Mr. Morva tried to do anything dangerous or inappropriate. At least one of the officers held something in his hand throughout the trial that looked to me like a Tazer or a remote control device that could be used to control Mr. Morva." SHA Vol. 1, at 196, ¶ 10. Juror James Butler stated in his affidavit, "Mr. Morva was restrained during the trial, and I was aware of it at the time. I could see a large bulge around Mr. Morva's waist beneath his clothes. Someone connected with the court (perhaps a deputy) informed me that Mr. Morva was wearing a stun belt and that it was operated by remote control by the deputies who stood guard behind him. One guard sat directly behind Mr. Morva and another deputy stood behind him with the electronic remote control device. If he made an attempt to escape or attack anyone, the deputies would activate the stun belt." SHA Vol. 1, at 193-94, ¶ 13.

Two alternate jurors provided affidavits which state habeas counsel filed in support of Morva's petition. Alternate Juror Patricia Carver averred, "I remember one juror told me that Mr. Morva was wearing shackles during the trial. I personally do not recall whether I saw Mr. Morva wearing shackles in the courtroom, but when I watched the evening news with my husband after a day in court, I saw Mr. Morva being taken into the courthouse in shackles." SHA Vol. 1, at 390, ¶ 4. Another alternate juror, Mary Campbell, reported seeing an odd bulge under Morva's clothing and that other jurors said the bulge was a stun belt. This same alternate juror stated that Morva's feet were chained together at trial and that she saw him wearing handcuffs when he walked into the courtroom and until they were removed when he sat at the defense table. SHA Vol. 1, at 350-51,

39

¶¶ 4-7.  In a second affidavit filed in support of the Warden's motion to dismiss the state habeas

petition, Campbell recanted her prior affidavit to an extent, stating that the first affidavit was not

accurate, she never said she saw Morva's feet chained together, she was well positioned to see Morva

during trial, and she never saw Morva's feet chained together during trial.  Warden's Motion to

Dismiss State Habeas Pet., Ex. 3, ¶¶ 3-5.  Regardless, as both alternate jurors were dismissed from

jury service before deliberations, their observations had no impact on the verdicts.

     The Supreme Court of Virginia considered these affidavits when it addressed this claim on

the merits, concluding as follows:

> Although some jurors executed affidavits after the trial stating that
> during the trial they became aware that Morva was wearing a stun
> belt, Morva proffers no evidence to suggest Morva's counsel was or
> should have been aware any juror had learned that information
> during trial.  Because Morva was not visibly restrained in the presence
> of the jury and because there is no evidence that counsel was or
> should have been aware that jurors had learned Morva was wearing a
> stun belt under his clothing, trial counsel's failure to object to the
> restraints or stun belt placed on Morva was not deficient
> performance.  Moreover, the security measures were justified given
> Morva's demonstrated history, which showed a willingness to use
> violence to effect and maintain an escape from custody, and were not
> inherently prejudicial.  See Porter v. Commonwealth, 276 Va. 203,
> 263, 661 S.E.2d 415, 446 (2008).  Thus Morva has failed to
> demonstrate that counsel's performance was deficient or that there is
> a reasonable probability that, but for counsel's alleged errors, the
> result of the proceeding would have been different.

Morva v. Warden, 285 Va. at 514, 741 S.E.2d at 785.

     Claim II(B) does not warrant federal habeas relief.  In Deck v. Missouri, 544 U.S. 622 (2005),

the United States Supreme Court held that the Constitution forbids the use of visible shackles on a

capital defendant during a capital trial's guilt and penalty phases unless that use is "justified by an

essential state interest," like courtroom security, specific to that defendant.  544 U.S. at 626, 630,

632. The jurors in <u>Deck</u> could see the defendant visibly shackled during the penalty phase of trial. The Court determined that visibly shackling the defendant was inherently prejudicial when "a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury[.]" <u>Id.</u> at 635. To be sure, Morva wore a stun belt under his clothes, and a few jurors observed the bulge the belt caused. The Supreme Court of Virginia concluded that Morva was not visibly restrained, and this determination of fact was not unreasonable. The fact that a few jurors saw a bulge under Morva's clothes and concluded that he was in some manner restrained does not offend the Due Process Clause under the circumstances of this case. Neither Morva's hands nor his feet were shackled, and given the nature of the charges being tried, there was plenty of reason for Morva to wear restraints under his clothing. The Supreme Court of Virginia found on the basis of the record that "all visible restraints were removed from Morva prior to the jurors entering the courtroom," and that his claim had no merit. <u>Morva v. Warden</u>, 285 Va. at 513-14, 741 S.E.2d at 785. Given Morva's history of violent escape, the stun belt he wore at trial under his clothing was certainly warranted and does not, under the circumstances of this case, constitute a due process violation. Nor is there any evidence to suggest that trial counsel had any clue that certain jurors observed the bulge under Morva's clothes and surmised that it was a stun belt controlled by nearby officers. Trial counsel had no basis upon which to lodge an objection and cannot be faulted for not doing so. As such, the Supreme Court of Virginia did not unreasonably determine the facts or unreasonably apply <u>Deck</u> or <u>Strickland</u>. Claim II(B) must be dismissed.

### C. Claim III – Exclusion of Potential Juror Mary Blevins

In claim III, Morva argues that he was deprived of a fair trial and impartial jury when the circuit court excluded Mary Blevins from the venire for her statements about the death penalty.

41

Morva claims that the circuit court erred when it determined Mary Blevins was unable to consider the death penalty as an appropriate punishment. The Supreme Court of Virginia dismissed this claim on direct appeal, finding the circuit court did not abuse its discretion to exclude a venire member who admittedly could not impartially consider all sentencing options provided by law.

The Supreme Court of Virginia's adjudication of claim III was not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts. During voir dire, when first asked by the prosecution whether she could impose the death penalty, Mary Blevins stated "I don't know about that." Direct Appeal JA at 888-89. When her response was probed further about whether she could ever give the death penalty, Mary Blevins stated "[p]robably certain circumstances I could. It's just questionable." Id. at 889. Questioned further, Mary Blevins stated that there were sets of circumstances under which she could consider the death penalty and under which she could give someone life in prison without possibility of parole Id. at 890-91. Upon questioning by defense counsel, Mary Blevins equivocated again. "I said I thought I could probably do it until I actually come down to the line. I don't know if I could do it. Vote for the death penalty." Id. at 905-06. She then responded that she could consider voting for the death penalty and for life, stating "[i]t would be a tough decision." Id. at 906. When asked about a reference in her response to a jury questionnaire to her faith, Mary Blevins stated: "[w]ell I think it's the faith that would keep me from voting for the death penalty, and then I think what I meant is if it was a child abuse case I probably couldn't, I would assume guilty before I ever got here." Id. at 908. The trial court sought to parse Mary Blevins' responses, stating that he was "getting some mixed signals about whether or not, under certain circumstances, you would consider the imposition of the death penalty." Id. at 913. This colloquoy ensued:

42

> Judge Grubbs:  Now you made some comment, if I understood you correctly, that perhaps your faith would prevent you from imposing a death penalty.  Did I hear you correctly, or what did you mean by that statement?  Because I believe another response that you made was that under certain circumstances you could impose the death penalty.
>
> Jury Panel Member:  I guess I'm sending mixed feelings right there; aren't I?
>
> Judge Grubbs: That's what I got.
>
> Jury Panel Member:  Yes.
>
> Judge Grubbs:  And as I say, you need to think about it.  And I'm sure it's –
>
> Jury Panel Member:  I don't think I could.
>
> Judge Grubbs:  You do not think you could impose the death penalty after considering all the evidence?
>
> Jury Panel Member:  I don't.  I don't.

Id. at 914.  In short, Mary Blevins gave equivocal responses to inquiries from counsel concerning whether she could consider imposing the death penalty.  When the trial judge asked Mary Blevins to clarify her mixed messages about her stance on the death penalty, she ultimately concluded that she did not think she could impose the death penalty even after considering all the evidence.  Plainly, given Mary Blevins' responses to the questions posed to her, it was not unreasonable for the Supreme Court of Virginia to determine that Mary Blevins could not impartially consider all sentencing options provided by law.

In Wainwright v. Witt, 469 U.S. 412 (1985), the United States Supreme Court reiterated that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . . is whether the juror's views would prevent or

43

substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 469 U.S. at 424 (internal quotation marks and footnote omitted). The Court noted that a trial judge's determination of venire member's bias is entitled to factual deference on habeas review. Id. at 428-29.

In light of the reasonable factual disposition and federal law, the Supreme Court of Virginia did not unreasonably apply federal law to affirm the exclusion of Mary Blevins. Instead, in response to the circuit court's direct inquiry, Mary Blevins clearly stated that she did not think she could impose the death penalty even after considering all the evidence. Accordingly, claim III has no merit and must be dismissed.

### D. Claim IV – Stipulation That Morva Was a Prisoner or In Custody

Morva argues in claim IV that trial counsel rendered ineffective assistance by stipulating that Morva was "a prisoner in a state or local correctional facility" and that he "was in lawful custody" on the dates of the killings. State habeas counsel did not present this claim to the Supreme Court of Virginia and, in an effort to excuse the procedural default, Morva argues that state habeas counsel rendered ineffective assistance by failing to raise this claim. In support of this argument, Morva filed an affidavit from state habeas counsel stating that she "completely overlooked" claim IV because she "did not register that there was any significance to the fact that Morva was no longer in a correctional facility or in the custody of that facility's employee when he killed McFarland." Counsel Aff., Dkt. No. 111-1 at 22, ¶ 4.

The stipulation at issue in claim IV was read to the jury following opening statements on March 6, 2008. The circuit court stated:

> Ladies and gentlemen, that completes the opening statement of counsel. We will now begin with the presentation of evidence. The

44

first evidence which you are to consider, along with all the other evidence which shall be presented during the course of this trial, is a stipulation of fact, or by that I mean, an agreement of fact, which has been reached by both the Commonwealth and the defense. That statement is as follows, or that stipulation is as follows, that on the dates in question for the crimes charged, that is August 20th and August 21st of 2006, that the Defendant was a prisoner in a state or local correctional facility. That the Defendant was imprisoned, but not yet had gone to trial on the criminal offenses, and that the Defendant was in lawful custody. That is the extent of the stipulation.

Direct Appeal JA at 1396-97.

As is evident from the argument of counsel leading up to the stipulation, this stipulation was directed to the escape charge. In addition to the capital murder charges, Morva was charged with escape under Virginia Code § 18.2-478. That statute makes it unlawful for a "person lawfully imprisoned in jail and not tried or sentenced" to escape "from jail by force or violence." The statute also makes it unlawful for any "person lawfully in the custody of any police officer on a charge of criminal offense" to escape "from such custody by force or violence." Va. Code Ann. § 18.2-478. The stipulation reached stemmed from efforts made by trial counsel to keep the nature of Morva's underlying charges from coming into evidence at the guilt stage of the trial. Direct Appeal JA at 1070-89. The prosecution argued that the existence of Morva's underlying charges was an element of the escape offense which it needed to prove at trial. The prosecution also argued that the nature of the underlying charges was relevant to Morva's motive to escape and commit the murders, stating, "This is motive evidence as to the escape, and it's motive evidence as to the murders. We've got a situation here, Judge, where the Defendant, . . . three days after he escaped, he was facing a jury trial. He was facing a jury trial where he was facing over a hundred years in prison." Id. at 1083. Trial counsel countered that the prosecution could establish that Morva was "lawfully

45

imprisoned in jail and not tried or sentenced on a criminal offense" within the meaning of Virginia

Code § 18.2-478 without telling the jury the nature of the underlying robbery, burglary, and use of a

firearm charges Morva was facing. Trial counsel argued:

> We submit in this matter, the Commonwealth will be able to prove by
> ample evidence that Mr. Morva was lawfully charged and indicted, had
> not been tried or sentenced, and was in the prison, in the Montgomery
> County [J]ail, at the time of the alleged offenses, without having to tell
> this jury what the nature of those underlying offenses for which he
> was being held were as it relates to relevance and its prejudicial value.

Id. at 1072. The circuit court granted trial counsel's motion, ruling that the prosecution had the

ability to prove the elements of the escape charge:

> [I]independently of the introduction of these charges by such means
> as authenticated copies of the Court order denying bail or by the jail
> commitment card, by way of example. The probative value in
> introducing these charges, in the Court's opinion, particularly in this
> phase of the trial is outweighed by the potential prejudicial effect
> upon the Defendant. Consequently the motion is granted. However,
> it is fully understood that should this trial enter in to the sentencing
> phase, then the convictions of these charges will be admissible by the
> Commonwealth.

Id. at 1354. Following this ruling, the prosecution advised the circuit court of the stipulation

reached by the parties. After the stipulation was read to the jury, the prosecution introduced trial

and custody orders with the underlying charges redacted. Id. at 1396-99.[18]

Morva argues that this stipulation constitutes ineffective assistance of counsel because

Morva killed McFarland after he had escaped from Deputy Quesenberry's custody. Thus, Morva

posits, he could not have been convicted of the capital crime of committing a murder while in

---

[18] Morva argues that because the circuit court had already ruled in Morva's favor that the underlying state charges on which he was awaiting trial ought not come into evidence, there was no need for the stipulation. As will be explained below, because the stipulation was simply a restatement of black letter Virginia law, there is no need for the court to further inquire into trial counsel's additional reasons motivating the stipulation.

46

custody because he shot McFarland after he escaped from custody. Indeed, Morva argues that his conviction for capital murder for killing another while in custody is inconsistent with his conviction for escape because he shot McFarland after he bludgeoned Deputy Quesenberry, took his gun, and was on the run.

The court cannot accept Morva's argument. Morva focuses his argument entirely on the custody prong of Virginia Code § 18.2-31(3) and ignores the prisoner prong. The statute defines capital murder to include the following: "The willful, deliberate, and premeditated killing of any person by a prisoner confined in a state or local correctional facility as defined in § 53.1-1, or while in the custody of an employee thereof." Regardless of whether Morva was "in the custody of an employee" of a correctional facility after he took Deputy Quesenberry's gun and fled the hospital, Virginia law continued to consider him to be a "prisoner confined" in a correctional facility even after his escape.

Virginia law is clear that one's status as a prisoner is not dependent on one's physical location. "The term 'prisoner in a . . . correctional facility' refers to the status of the escapee, not to the circumstances of the escape." Mabe v. Commonwealth, 14 Va. App. 439, 441, 417 S.E.2d 899, 900 (Va. Ct. App. 1992). Richard Mabe was incarcerated in the Washington County Jail on a felony conviction. Given his trustee status, he was assigned to work outside the jail at a Senior Citizen's Center under the supervision of an employee of the center. Mabe disappeared from the Senior Citizen's Center and, once captured, was charged with escape from a correctional facility under Virginia Code § 53.1-203. Following his escape conviction, Mabe argued to the Court of Appeals of Virginia that "the statute requires that the escapee be physically 'in' the facility at the time of the escape." 14 Va. App. at 440, 417 S.E.2d at 900. The Court of Appeals of Virginia had little

47

difficulty disposing of Mabe's argument, concluding that "[h]e was, in every sense, a 'prisoner in a . . . correctional facility,'" even though physically located at the Senior Citizen's Center. 14 Va. App. at 441, 417 S.E.2d at 900.

The Mabe decision cited the opinion from this district in Wood v. Cox, 333 F. Supp. 1064 (W.D. Va. 1971), in support of this conclusion. Wood was a habeas corpus case challenging a state conviction for escape from an inmate road work crew. In that case, Ralph Wood failed to return to his work detail or prison camp following a detour to the woods to use the toilet. The statute in effect at the time, Virginia Code § 53-291, made it unlawful for an inmate of a penal institution to "escape from such penal institution or from any person in charge of such inmate." The court found it to be of no moment that Wood was not physically inside a prison at the time of his escape. "Since the petitioner was at all times a convict in the state penitentiary system, it is immaterial for the purposes of the penal statute that he escaped while working on a public road." 333 F. Supp. at 1065.

The legal tenet that a person's status as prisoner is not dependent on his physical location also was recognized in Simmons v. Commonwealth, 16 Va. App. 621, 431 S.E.2d 335 (Va. Ct. App. 1993). Gregory Simmons, incarcerated in the Lynchburg City Jail, was released on furlough for three hours to attend a funeral. When Simmons did not return, he was apprehended and charged with escape in violation of Virginia Code § 53.1-203. Quoting Mabe, the Simmons court noted that the "term 'prisoner in a . . . correctional facility' refers to the status of the escapee, not to the circumstances of escape." 16 Va. App. at 623, 431 S.E.2d at 336. The court added, "This status is not dependent upon actual physical presence in such facility or otherwise restricted by a prisoner's location. Thus, although defendant had been granted a three hour furlough, he remained 'in every

48

sense, a "prisoner in a . . . correctional facility."" Id. (quoting Mabe, 14 Va. App. at 441, 417 S.E.2d at 900) (internal citation and footnote removed).

Consistently, the Supreme Court of Virginia has held that the killing need not take place in the correctional facility to which the prisoner was confined for the capital murder statute to apply. In Jefferson v. Commonwealth, 214 Va. 747, 204 S.E.2d 258 (1974), the court affirmed the capital murder conviction of an inmate who killed a prison guard during an escape attempt from a courthouse. The court found "no merit in the defendant's argument that the statute applies only to a killing within the penal institution to which Jefferson was confined." 214 Va. at 752, 204 S.E.2d at 262 (citing Ruffin v. Commonwealth, 62 Va. (21 Grat.) 790, 793-94, 1871 WL 4928 (1871)).

Ruffin concerned the application of the capital murder statute to the murder of a guard by a prisoner hired out to the railroad. The court reasoned:

> Though at the time of the commission of the murder of which he was convicted, he was not within the walls of the penitentiary, but in a distant part of the State, he was yet, in the eye of the law, still *a convict in the penitentiary*; not, indeed, actually and bodily within its walls, imprisoned and physically restrained by its bars and bolts; but as certainly under the restraints of the laws, and as actually bound by the regulations of that institution, as if he had been locked within one of its cells. These laws and regulations attach to the person of the convict wherever he may be carried by authority of law, (or even when he makes his escape), as certainly and tenaciously as the ball and chain which he drags after him. And if when hired upon the public works, though hundreds of miles from the penitentiary, he kills a guard stationed over him by authority of law, he is as guilty of killing a guard of the penitentiary within the meaning of the statute, as if he had killed an officer or regular guard of that institution within its very walls.

49

Ruffin, supra at *3 (original emphasis).[19]

More than a hundred years later, the holding in Ruffin remains the law of Virginia, affirmed as recently as 1990 in Mu'Min v. Commonwealth, 239 Va. 433, 389 S.E.2d 886 (1990). David Mu'Min, an inmate at a Virginia field unit, was assigned to a Virginia Department of Transportation work detail. While on the work detail, Mu'Min sharpened a short piece of metal and concealed it in his pocket. During a lunch break, Mu'Min left the work area and walked a mile to a shopping center where he killed a woman with the sharpened metal piece. The Supreme Court of Virginia noted that an element of one of the forms of the capital offense charged was that Mu'Min was then "a prisoner confined in a state or local correctional facility." 239 Va. at 445, 389 S.E.2d at 894. Defining this term, the trial court instructed the jury as follows: "An inmate of a state correctional facility remains an inmate at all times until he is released from that status by the proper state authority. An inmate who escapes from custody retains the status of inmate during the entire course of such unauthorized absence." Citing Ruffin and Jefferson, the Supreme Court of Virginia in Mu'Min stated that "[t]his is a correct statement of the law in this Commonwealth." Id. at n.7.

The circuit court gave a nearly identical instruction in Morva's case. Jury instruction 9 stated, "A prisoner of a state or local correctional facility remains a prisoner at all times until he is released from that status by the proper state authority. A prisoner who escapes from custody retains the status of prisoner during the entire course of such an unauthorized absence." Direct Appeal JA at 1968.

---

[19] While Ruffin has been appropriately subject to criticism for the notion that prisoners are "slaves of the State," lacking any rights, 1871 WL 4928, at *5, the court's conclusion that the capital murder statute is not limited to killings by prisoners inside the physical walls of a prison remains intact.

50

While Morva argues that he could not have been in custody at the time he shot McFarland because he had escaped, that does not alter the fact that, under Virginia law, he was still a prisoner. Under Virginia law, it was Morva's status as a prisoner, rather than his physical location, which determined whether the capital murder charge applied to him. Under this precedent, the fact that Morva's killings took place outside of the Montgomery County Jail and after he escaped from Deputy Quesenberry's custody is of no moment. Because Morva's killings were done while he was "a prisoner confined in a state or local correctional facility," the capital murder statute applied.

The stipulation agreed to by trial counsel, intended to limit the prejudicial impact of the underlying state charges, does nothing more than restate black letter Virginia law as to the prisoner prong of Virginia Code § 18.2-31(3) and does not constitute prejudice under Strickland. As such, claim IV presents no substantial claim of ineffective assistance of counsel. Accordingly, claim IV must be dismissed as procedurally defaulted.

### E. Claim V – Failure to Properly Investigate Evidence of the Shootings

In claim V, Morva argues that trial counsel rendered ineffective assistance by not investigating and challenging forensic and other evidence related to the shootings. Morva argues that trial counsel should have questioned hospital witnesses, including Jennifer Preston, about whether McFarland wore a paramilitary style uniform having multiple pockets and bulges. Morva complains that trial counsel should have argued that such a uniform made it difficult for Morva to discern whether McFarland had a weapon, giving rise to a self-defense argument.

As for the shooting of Corporal Sutphin, Morva alleges trial counsel rendered ineffective assistance for not impeaching Officer Roe's testimony that Corporal Sutphin's firearm remained strapped in his holster. Morva argues that proper cross examination would have supported Morva's

51

belief that Corporal Sutphin intended to draw a weapon, causing Morva to shoot first in self-defense.

The Supreme Court of Virginia dismissed these arguments on habeas review. As to the cross examination of Preston, the Supreme Court of Virginia determined Morva failed to state an ineffective assistance claim, explaining:

> The record, including the trial transcript, demonstrates Preston testified that the events she witnessed, including the shooting, took mere seconds. She testified that she observed McFarland standing very still with his hands outstretched in a supplicating gesture, and Morva standing very still and pointing a gun at McFarland. She stated she clearly saw the expression on each man's face, and then she saw Morva shoot McFarland. There is no evidence in the record, and Morva proffers none, that Preston was not looking at McFarland when Morva pulled the trigger.

> The witnesses testified that McFarland's uniform consisted of a dark shirt with a patch and matching trousers. Morva does not proffer any evidence, nor is there any in the record, to support his claim that McFarland's uniform was paramilitary or likely mistaken for that of armed law-enforcement personnel. Furthermore, Morva fails to provide evidence of any gestures made by McFarland that would indicate he was reaching for a firearm before he was shot.

> Even if McFarland was armed and was wearing a paramilitary type uniform, Morva shot McFarland as he stood in front of Morva with his hands in a supplicating gesture. Counsel was not ineffective for failing to raise a frivolous argument that Morva was justified in shooting McFarland.

Morva v. Warden, 285 Va. at 514-15, 741 S.E.2d at 785-86. The Supreme Court of Virginia determined that Morva failed to state an ineffective assistance claim about cross examining Officer Roe because "[n]o witnesses testified that Corporal Sutphin's holster was unsnapped and Officer Roe could not have been cross examined on the hearsay reports of others. Morva fails to establish

52

that more comprehensive cross examination would have resulted in Officer Roe changing his unequivocal, uncontradicted testimony." Id. at 516, 741 S.E.2d at 787.

The Supreme Court of Virginia's adjudication of claim V was not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts. The record reflects that hospital security guard McFarland was unarmed and wore long, dark pants with a matching dark shirt with a patch on the sleeve; thus, there was no indication in the record that the clothes bore any resemblance to a paramilitary uniform. Direct Appeal JA at 1527. Nothing in the record supports the proposition McFarland carried or reached for a weapon. Id. at 1539, 1574. Furthermore, Morva was standing close enough to McFarland to hold Deputy Quesenberry's pistol some two feet from McFarland's face while McFarland appeared peaceable with his arms stretched out and palms facing out. The Supreme Court's determination that trial counsel were not ineffective in their investigation of McFarland's shooting was not unreasonable.

The same is true as to the claim that counsel were ineffective regarding counsel's examination of trial witnesses concerning Corporal Sutphin's shooting. Officer Roe testified that Corporal Sutphin's firearm was still "snapped in the holster" before Roe removed and secured it and that there was no indication that Corporal Sutphin had drawn any weapon before Morva shot him in the back of the head. Direct Appeal JA at 1761, 1763-64. Morva argues that trial counsel could have impeached this testimony had trial counsel properly investigated Corporal Sutphin's murder.

Morva cites an unsigned report from Sydney Gay, a responding EMT, that claims Corporal Sutphin's firearm was still in the holster when he arrived at the crime scene. SHA Vol. 2, at 733. Morva also cites a police report from Blacksburg Police Officer Q. Self, who wrote that he saw

53

Officer Roe standing at Corporal Sutphin's body, that he saw Corporal Sutphin's firearm strapped in its holster, and that a Blacksburg Rescue Squad member handed him Corporal Sutphin's firearm, not Officer Roe.  SHA Vol. 2, at 731.  Morva cites an unsigned report from Marshall Frank, another EMT, which reads, "I personally removed [Corporal Sutphin's] service weapon from his holster and handed it to Blacksburg Officer Self.  The weapon was undrawn with the holster retention strap unstrapped."  SHA Vol. 2, at 736.

Morva argues that trial counsel were ineffective by not confronting Officer Roe with the accounts of the other first responders that a rescue squad member, and not Officer Roe, removed Corporal Sutphin's pistol from its holster and that the holster strap was unstrapped.  Even had trial counsel been able to raise some question in the mind of the jury as to whether Officer Roe, as opposed to another first responder, removed Corporal Sutphin's pistol from its holster or whether the holster was strapped or not, two critical facts as to the shooting remain unchanged:  (1) Corporal Sutphin was shot in the back of the head, and (2) his pistol was undrawn and in his holster.  Nothing about the line of cross examination Morva claims trial counsel should have pursued could have changed these unassailable facts or advanced his claim that he shot Corporal Sutphin in self-defense.  As such, there is no reasonable probability that the outcome would have changed.

In short, regardless of which first responder retrieved the pistol or whether the strap was fastened, all present reported that Corporal Sutphin's gun was undrawn and holstered.  Further, Morva's contention that Corporal Sutphin made an effort to draw his weapon is completely undermined by the physical evidence that Corporal Sutphin was shot in the back of his head.  Any prejudice from trial counsel not impeaching Officer Roe's testimony about who, in fact, removed

54

Corporal Sutphin's pistol from its holster or whether the holster was strapped had no reasonable probability of changing the outcome. There is no merit to claim V.

## F. Claim VI – Conditions at the Montgomery County Jail

In claim VI, Morva argues that trial counsel rendered ineffective assistance by not investigating and presenting evidence about the conditions of confinement at the Montgomery County Jail to support a claim of imperfect self-defense.[20] Citing a report from Virginia's Compensation Board, Morva alleges that the Montgomery County Jail housed inmates at 237% to 300% of its rated capacity in 2005 and 2006 when Morva was housed there, and consequently, the jail's average programming and medical spending per inmate decreased. Second Am. Pet., Dkt. No. 111, at 76-77. Morva argues that these statistics indicate that inmates were unable to receive necessary medical care, were exposed to an ever-present threat of violent attack, and lacked privacy. Morva cites his dissatisfaction with the medical treatment at the jail for his digestive and sinus issues and an infected wound on his arm as the reasons he escaped to save his life. Morva believes that the jurors would have understood why he escaped and killed McFarland and Corporal Sutphin had they learned of the conditions of his confinement.

The Supreme Court of Virginia dismissed this claim on habeas review because the ineffective assistance claim was frivolous as the record "demonstrate[d] that Morva was not exposed to any unique conditions of confinement and Morva was not denied medical treatment." Morva v. Warden, 285 Va. at 517, 741 S.E.2d at 787. The Supreme Court of Virginia further concluded that

---

[20] An "instance of imperfect self-defense is found in the situation where the accused kills because he thinks his life is in danger but his belief is an unreasonable one." Couture v. Commonwealth, 51 Va. App. 239, 249 n.2, 656 S.E.2d 425, 430 n.2 (2008) (quoting Roy Moreland, The Law of Homicide 93 (1952)).

55

the conditions of confinement, even if true, "would not have provided a viable defense to the murders he committed, and would not have mitigated the murders." Id. The Supreme Court of Virginia explained:

> Morva's alleged fear that his return to Montgomery County Jail might result in his death within a few months from some unnamed danger did not create a valid claim of self-defense, nor was it reasonably probable that the jury would have perceived his alleged fear as mitigating evidence for his murder of two innocent people. Also, the record does not support Morva's allegation that he was persistently denied necessary medical attention. In fact, he had been taken to the hospital for medical treatment at the time he attacked two of the victims and escaped.

Morva v. Warden, 285 Va. at 518, 741 S.E.2d at 787-88.

Morva argues that the Supreme Court of Virginia unreasonably determined that he was not persistently denied medical attention and that the conditions at the Montgomery County Jail were not unique, and Morva further faults the Supreme Court of Virginia for not considering a claim of imperfect self-defense. Morva believes that Supreme Court of Virginia mistakenly addressed "a claim of self-defense that was not alleged" because it concluded that "the record demonstrates no person could reasonably have apprehended imminent death[.]" Morva's Resp. to Mot. to Dismiss, Dkt. No. 73, at 37-38. In contrast, Morva argues that his claim of imperfect self-defense is based on a sincere yet unreasonable apprehension. Id. As such, he contends that the Supreme Court of Virginia missed the point of his argument.

The Supreme Court of Virginia's adjudication of claim VI was not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts. The Supreme Court of Virginia recognized, and rejected, Morva's imperfect self-defense argument: "[A]ccording to Morva, even if the jury found his 'fear to be

56

unreasonable, the evidence was sufficient to present argument and instruction . . . with regard to a potential lesser-included offense and in mitigation of the death sentence.'" Morva v. Warden, 285 Va. at 517-18, 741 S.E.2d at 787 (ellipses in original). The fact that the Supreme Court of Virginia did not find a viable argument in support of self-defense, whether it be a perfect or imperfect self-defense, is not an unreasonable determination of the facts of this case. Morva fails to show that the average cost per inmate had any bearing on Morva's receipt of medical care or that he was otherwise denied medical care. The state habeas record reveals that Morva was able to see a physician at the Montgomery County Jail and received medical services and medicine. Indeed, he was receiving medical care at the Montgomery Regional Hospital at the time of his escape. Plainly, Morva cannot establish that he requested and was denied medical service. SHA Vol. 5, at 2004, 2014, 2016-24.

Moreover, the Supreme Court of Virginia did not unreasonably apply Strickland when it concluded that it was not reasonably probable that the jury would have considered his imperfect self-defense argument to save him from the death penalty for the murders of McFarland and Corporal Sutphin. There is no basis to conclude that any reasonable juror would have accepted the argument that an escaped prisoner can invoke his desire, reasonable or unreasonable, not to return to incarceration to justify a killing spree.[21] Simply put, trial counsel were not ineffective for not making an argument that no reasonable juror could accept.

---

[21] As previously discussed, Morva sought discovery on conditions at the Montgomery County Jail, both during state habeas proceedings and here. Morva's request for discovery simply is immaterial. Regardless of the conditions at the Montgomery County Jail in August 2006, the Supreme Court of Virginia correctly concluded that the law does not grant an inmate the privilege "to kill any individual, no matter how innocent or lacking in culpability, who presents a bar to that escape." Morva v. Warden, 285 Va. at 518, 741 S.E.2d at 787.

### G. Claim VII – Jury Instruction 8A

In claim VII, Morva challenges jury instruction 8A. Jury instruction 8A stated, "You may infer that every person intends the natural and probable consequences of his acts." Direct Appeal JA at 1968:11-13. In claim VII, Morva argues that instruction 8A violated due process either by creating a conclusive or irrebuttable presumption of intent, or by negating or diminishing the presumption of innocence. The Supreme Court of Virginia rejected this claim on direct review, relying on Schmitt v. Commonwealth, 262 Va. 127, 145, 547 S.E.2d 186, 198-99 (2001).

In Schmitt, the Supreme Court of Virginia held that a jury instruction using the same language as in instruction 8A did not negate or diminish the effect of the presumption of innocence but, instead, stated a permissive inference due to the use of the modal verb "may." The Supreme Court of Virginia concluded that the permissive use of "may" in that instruction "did not require the jurors to draw any inference or alter the Commonwealth's burden of proving [the defendant]'s criminal intent beyond a reasonable doubt." Id.

The Supreme Court of Virginia cited Sandstrom v. Montana, 442 U.S. 510, 521 (1979), in support of its holding in Schmitt. The pertinent instruction in Sandstrom was, "[T]he law presumes that a person intends the ordinary consequences of his voluntary acts[,]" and the United States Supreme Court sought to resolve whether that instruction violated due process by unlawfully shifting to the defendant the burden of proof about the defendant's purpose or knowledge. The Court noted that the analysis first depended on "the nature of the presumption" the instruction describes, which in turn depends on "careful attention to the words actually spoken to the jury" to determine the way a reasonable juror could have interpreted the instruction. Sandstrom, 442 U.S. at 514. After noting the definition of "presume" meant "to suppose to be true without proof," the

58

Court held that a reasonable jury "could well have interpreted" the phrase "the law presumes" as an instruction either: (1) to find intent once "convinced of the facts triggering the presumption[,]" or (2) to find intent "unless the defendant proved the contrary[,] . . . effectively shifting the burden of persuasion on the element of intent." Id. at 517 (emphasis omitted). The Court ultimately found that the instruction violated due process because a reasonable juror could have thought the phrase "the law presumes" shifted the burden of persuasion as to intent to the defendant.

The Supreme Court of Virginia's adjudication of claim VII was not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts. Although Morva argues that instruction 8A could have been written more clearly by adding the words "unless you choose not to do so" or the phrase "but are not required to do so," the use of "may" satisfied due process.[22] The words actually spoken to the jury in instruction 8A plainly described a permissive inference by allowing, but not requiring, the jury to infer that one intends the natural and probable consequences of an act. In order to find a violation of Sandstrom, the court would have to read the permissive term "may" in the instruction given in this case as the mandatory terms "should" or "shall." Phrased as it was, instruction 8A permitted the jury to infer intent as to the consequences of an act, but did not require such an inference. As such, it did not improperly shift the burden of proof, run afoul of Sandstrom, or violate due process. Accordingly, claim VII must be dismissed.

---

[22] Thus, Morva proposes that the instruction should have said, "You may infer, unless you choose not to do so, that every person intends the natural and probable consequences of his acts," or, "You may infer, but are not required to do so, that every person intends the natural and probable consequences of his acts." Second Am. Pet., Dkt. No. 111, at 90.

### H. Claim VIII – Failure to Object to the Third Capital Charge on Double Jeopardy Grounds and Failure to Object that the Verdict Forms Triple Counted the Capital Charges and Misled the Jury into Imposing the Death Penalty

In claim VIII(A), Morva argues that trial counsel rendered ineffective assistance by not making a "double jeopardy objection" to the third capital murder charge for the premeditated murder of more than one person within a three-year period.

The Double Jeopardy Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]" U.S. Const. amend. V.

> Because it was designed originally to embody the protection of the common-law pleas of former jeopardy, see United States v. Wilson, 420 U.S. 332, 339-340 (1975), the Fifth Amendment double jeopardy guarantee serves principally as a restraint on courts and prosecutors. The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments; but once the legislature has acted courts may not impose more than one punishment for the same offense and prosecutors ordinarily may not attempt to secure that punishment in more than one trial.

Brown v. Ohio, 432 U.S. 161, 165 (1977). The Fifth Amendment guarantee against double jeopardy consists of three separate constitutional protections. "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 715 (1969) (footnotes omitted). As Morva faced only one prosecution, only the third guarantee – prohibiting multiple punishments for the same offense – is at issue here.

In claim VIII(A), Morva argues that his conviction on the third capital murder charge, for killing more than one person in a three-year period, is impermissibly derivative of his two other

60

capital murder charges. As such, he claims it violates the Double Jeopardy Clause and the rule in Clagett v. Commonwealth, 252 Va. 79, 472 S.E.2d 263 (1996), cert. denied, 519 U.S. 1122 (1997).

Michael Clagett killed four people during the course of a tavern robbery in Virginia Beach. Clagett was charged in two indictments. The first indictment charged four separate counts of capital murder during the commission of a robbery, and the second indictment charged one count of multiple homicide capital murder. The jury convicted Clagett of the five death sentences for the four homicides. On appeal, Clagett asserted, and the Commonwealth agreed, that he had been "impermissibly punished with five death sentences for four homicides." Id. at 95, 472 S.E.2d at 272. Finding the conviction for multiple homicide capital murder to be derivative of the other four capital convictions, the Supreme Court of Virginia vacated the fifth capital conviction.[23]

Three years later in Payne v. Commonwealth, 257 Va. 216, 509 S.E.2d 293 (1999), the Supreme Court of Virginia addressed the question "whether there can be more than one death sentence imposed where there is only one victim." Id. at 227, 509 S.E.2d at 300. Eric Payne received two death sentences for each of two separate convictions. Payne received two death sentences for the killing of his first victim: one for capital murder in the commission of a robbery, and one for capital murder in the commission of rape. Payne also received two death sentences for

_____

[23] Morva adds that the prohibition against derivative capital sentences in Clagett was mentioned by the Supreme Court of Virginia in two subsequent cases. In Beck v. Commonwealth, 253 Va. 373, 376 n.*, 484 S.E.2d 898, 900 n.* (1997), Christopher Beck murdered three persons during the commission of a robbery and pled guilty to three capital offenses for those killings plus one for the capital murder of the three victims as part of a single act or transaction. Va. Code Ann. § 18.2-31(7). Citing Clagett, the Supreme Court of Virginia noted that the fourth capital murder charge had been nolle prossed and the fourth guilty plea withdrawn. Likewise, in Walton v. Commonwealth, 256 Va. 85, 501 S.E.2d 134 (1998), Percy Walton killed three persons during the commission of a robbery, and he was convicted of one capital murder charge for each killing plus a capital murder charge for the willful, deliberate, and premeditated killing of more than one person within a three-year period under Virginia Code § 18.2-31(8). Morva's third capital conviction was pursuant to the same statute. Again citing Clagett, the Supreme Court of Virginia noted that at the time of sentencing the trial court dismissed the fourth death sentence. Walton, 256 Va. at 87 n.*, 501 S.E.2d at 135 n.*.

61

the killing of his second victim: one for capital murder while in the commission of or subsequent to object sexual penetration, and one for capital murder while in the commission of or subsequent to attempted rape.

In addressing the double jeopardy challenge in Payne, the Supreme Court of Virginia noted that "[i]n the single-trial setting, 'the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.'" Id. at 227, 509 S.E.2d at 300 (quoting Brown v. Ohio, 432 U.S. at 165). "Thus, resolution of the question whether punishments imposed by a court are unconstitutionally multiple requires a determination of what punishments the legislature has authorized." Payne, 257 Va. at 227, 509 S.E.2d at 300 (citing Whalen v. United States, 445 U.S. 684, 688 (1980)). Reviewing the statute, the Payne court concluded that the language of Virginia Code § 18.2-31 expressed the legislative intent that there are multiple capital offenses. The Supreme Court of Virginia next looked to the rule in Blockburger v. United States, 284 U.S. 299 (1932). There, the United States Supreme Court stated, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Id. at 304. Because Payne violated distinct statutory provisions, the Supreme Court of Virginia concluded that each of his killings constituted two capital offenses. Payne, 257 Va. at 228, 509 S.E.2d at 301. The Payne court held that "each conviction was for the violation of a distinct statutory provision for which a separate statutory punishment was authorized. Consequently, the convictions and sentences do not

62

violate the constitutional guarantee of protection against multiple punishments for the same offense." Id. at 229, 509 S.E.2d at 301.[24]

The Supreme Court of Virginia addressed its opinions in Clagett and Payne in 2004 in Winston v. Commonwealth, 268 Va. 564, 604 S.E.2d 21 (2004). Leon Winston asserted a double jeopardy violation because the jury returned two verdicts of capital murder for the killing of one victim. After first noting that Winston's assignment of error did not assert a Clagett "multiple punishment double jeopardy" claim, the Supreme Court of Virginia stated:

> Furthermore, since Clagett, we have considered the question whether a defendant charged with capital murder can be convicted of more than one offense of capital murder of the same victim and whether a defendant can receive more than one death sentence for the killing of the same victim. In Payne, the defendant was convicted of two distinct statutory provisions of subsection 5 of Code § 18.2-31 involving the same victim. Because "each statutory provision required proof of a fact that the other did not," we held that Payne was properly convicted of two capital offenses in the killing of the same victim. Additionally, Payne was sentenced to two death sentences for the same victim. We observed, "[w]e think it is clear, as well as logical, that the General Assembly intended for each statutory offense to be punished separately 'as a Class 1 felony.'" 257 Va. at 228, 509 S.E.2d at 301. In approving the two death sentences for the capital murder of one victim, we further held "the convictions and sentences do not violate the constitutional guarantee of protection against multiple punishments for the same offense." Id. at 229, 509 S.E.2d at 301. The trial court did not err "by allowing two verdicts of capital murder of [the victim]."

---

[24] Justice Koontz, who authored Clagett, dissented in Payne as follows:

> Today, for the first time a majority of this Court concludes that by enacting Code § 18.2-31, our General Assembly has authorized the imposition of more than one death sentence for the capital murder of one victim. Indeed in the present cases, the majority concludes that Eric Christopher Payne is properly subject to the imposition of four death sentences for the capital murder of only two victims. I cannot join in such a patently strange result. Moreover, in my view, such a result was not intended and, consequently, was not authorized by our General Assembly in enacting Code § 18.2-31.

257 Va. at 229, 509 S.E.2d at 301.

<u>Winston</u>, 268 Va. at 614-15, 604 S.E.2d at 49-50.

In his state habeas petition, Morva raised a stand-alone double jeopardy challenge, contending that his case is indistinguishable from <u>Clagett</u>. The Supreme Court of Virginia did not address this issue, holding that it was barred under <u>Slayton</u>, 215 Va. at 29, 205 S.E.2d at 682, because it was not raised at trial or on direct appeal.

The Supreme Court of Virginia did address Morva's state habeas claim that trial counsel were ineffective for not raising a double jeopardy challenge to his third death sentence. After reviewing Virginia Code §§ 18.2-3(3), 18.2-3(6), and 18.2-3(8), the Supreme Court of Virginia determined that double jeopardy was not implicated because each subsection of the death penalty statute of which Morva was convicted had different elements. The Supreme Court of Virginia reasoned:

> Morva was sentenced to death for three separate capital offenses: capital murder while in custody, Code § 18.2-31(3), capital murder of a law-enforcement officer, Code § 18.2-31(6), and capital murder of more than one person within a three-year period, Code § 18.2-31(8). The elements of capital murder while in custody are: (1) the willful, deliberate, and premeditated killing; (2) of another; (3) by a prisoner of a state or local correctional facility, or while in the custody of an employee of such facility. The elements of capital murder of a law-enforcement officer are: (1) the willful, deliberate, and premeditated killing; (2) of a law-enforcement officer; (3) for the purpose of interfering with the performance of his official duties. The elements of capital murder of more than one person within a three-year period are: (1) the willful, deliberate, and premeditated killing; (2) of more than one person; (3) within a three-year period. The elements of each of these capital offenses are different and each carries its own separate penalty.

64

<u>Morva v. Warden</u>, 285 Va. at 519, 741 S.E.2d at 788. Citing <u>Payne</u>, the Supreme Court of Virginia concluded that Morva's trial counsel were not ineffective for not presenting a meritless double jeopardy challenge.

Claim VIII(A) of Morva's federal petition again raises <u>Clagett</u> and double jeopardy through the lens of ineffective assistance of counsel. Morva argues that, <u>Payne</u> notwithstanding, trial counsel should have made a <u>Clagett</u> objection to the third death sentence which was derived entirely from the fact of his two other killings.

The Supreme Court of Virginia's adjudication of claim VIII(A) was not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts. Morva's three capital sentences for violating Virginia Code § 18.2-31(3), (6), and (8) do not constitute double jeopardy because these subsections proscribe three separate and independent crimes. The established test for determining whether two offenses are sufficiently distinguishable to permit the imposition of cumulative punishment was stated in <u>Blockburger</u>:

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not . . . .

284 U.S. at 304. This test emphasizes the elements of the two crimes. "If each requires proof of a fact that the other does not, the <u>Blockburger</u> test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." <u>Iannelli v. United States</u>, 420 U.S. 770, 785 n.17 (1975).

Consistent with <u>Blockburger</u>, the Supreme Court of Virginia concluded in <u>Payne</u> that the General Assembly of Virginia clearly intended each subsection of § 18.2-31 "to be punished separately." 251 Va. at 228, 509 S.E.2d at 301. Following <u>Payne</u>, Morva's trial counsel were not

65

ineffective by not making a <u>Clagett</u> objection. Consistent with <u>Payne</u>, the Supreme Court of Virginia concluded in Morva's state habeas case that the three capital convictions were separate capital offenses having separate elements for which separate statutory punishments were authorized. This court is bound to accept the Supreme Court of Virginia's construction of Virginia's statutes. <u>Missouri v. Hunter</u>, 459 U.S. 359, 368 (1983). Indeed, in <u>Missouri v. Hunter</u>, itself a multiple punishment double jeopardy case, the Court held:

> Legislatures, not courts, prescribe the scope of punishments. Where, as here, a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes, proscribe the "same" conduct under <u>Blockburger</u>, a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.

<u>Id.</u> at 368-69 (footnote omitted). Given the holdings in <u>Blockburger</u> and <u>Missouri v. Hunter</u> and the construction the Supreme Court of Virginia has placed on the Virginia capital offense statute, Virginia Code § 18.2-31, it cannot be maintained that Morva's three death sentences run afoul of clearly established federal law. Nor is there any basis upon which to argue that they are based on an unreasonable determination of the facts. Accordingly, claim VIII(A) must be dismissed.

Morva argues in claim VIII(B) that the jury was misled into imposing the death penalty because trial counsel did not offer an instruction against "triple-counting" the capital murder charges and did not object to alleged duplicative jury verdict forms. Claim VIII(B) is procedurally defaulted, and to excuse that deficiency, Morva argues that state habeas counsel rendered ineffective assistance by not presenting claim VIII(B) to the Supreme Court of Virginia.

The circuit court instructed the jury to consider "any mitigation evidence . . . which do[es] not justify or excuse the offense, but which in fairness or mercy may extenuate or reduce the degree

66

of moral culpability and punishment." Direct Appeal JA at 2409. The circuit court also instructed the jury that, even if it found at least one aggravating factor to support imposing the death penalty, the jury could impose a life sentence and that "nothing in these instructions nor in the law requires you to sentence [Morva] to death no matter what your findings may be." Direct Appeal JA at 2406. After the circuit court gave that instruction, trial counsel reiterated to the jury that Virginia "law is such that it never ever, never ever, requires the imposition of the death penalty" and, "under any circumstances, you are never ever required to impose death as punishment." Direct Appeal JA at 2420, 2428.

Consistent with the circuit court's instructions during the sentencing phase, the circuit court provided the jury with alternative verdict forms. For the murder of Derrick McFarland, for example, the jury received seven forms: three forms imposing the death penalty and four forms imposing life imprisonment. The circuit court provided multiple forms because the Commonwealth argued that the death penalty was warranted for two separate statutory reasons: (1) that Morva posed a risk of future dangerousness, and (2) that Morva's conduct in committing the offense was outrageously or wantonly vile, horrible, inhuman or involved depravity of mind. The first death penalty form encompassed both of these reasons, and the other two forms concerned one reason each. Likewise, the four alternative verdict forms imposing life imprisonment reflected the options available to the jury. The first life imprisonment form was to be used in the event the jury found that the Commonwealth failed to meet its burden of proof regarding either statutory reason. The second and third life imprisonment forms were to be used in the event that the jury concluded that the Commonwealth met its burden of proof as to one of the statutory reasons, but that the jury, having considered all of the evidence in mitigation of the offense, fixed punishment at life

67

imprisonment. The fourth life imprisonment form was to deal with the situation where the jury found that the Commonwealth proved both statutory aggravating factors but decided to impose a life sentence regardless. These forms are not confusing, nor do they represent triple counting. Rather, the verdict forms provided to the jury, both for the sentences of death or life imprisonment, merely reflect the various sentencing options available to the jury. Consequently, the record refutes Morva's speculation that the jurors were confused about the possibility of imposing a life sentence instead of the death penalty. As such, claim VIII(B) presents no substantial claim of ineffective assistance of counsel and must be dismissed as procedurally defaulted.

### I. Claim IX – Failure to Investigate Morva's Background, Provide Information to the Mental Health Experts, and Otherwise Present Mitigation Evidence

In claim IX, Morva argues that trial counsel rendered ineffective assistance during the sentencing phase of trial. Specifically, Morva alleges trial counsel: (A) did not conduct an adequate investigation of Morva's background, history, character, and mental illness; (B) did not provide the available information to the mental health experts to ensure an accurate and reliable mental health evaluation; and, consequently, (C) did not adequately present all available mitigating evidence during the sentencing phase. The Supreme Court of Virginia dismissed these arguments on habeas review, and the court finds that the dismissal was not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts.

In support of claim IX(A), Morva argues that trial counsel "cut short their investigation and disregarded investigative 'red flags' pointing to the need for further investigation[,]" such as Morva's multi-generational mental illnesses and family history. Second Am. Pet., Dkt. No. 111, at 100-01. Morva faults trial counsel because they did not investigate his father's:

68

> Hungarian familial links, never conducted or proposed to conduct investigation in Hungary, never tried to contact family members in Hungary, never attempted to obtain any records from Hungary, never contacted relevant European non-governmental organizations (NGOs) or other organizations for assistance, never sought pro bono help from a law firm in Hungary, and never recognized that the Hungarian government or European NGOs would have conducted an investigation even without funding from the circuit court.

Id. at 109. Morva's father allegedly experienced emotional trauma from significant events in his life: his aunt was murdered; he was forced to serve in the Nazi-aligned Hungarian Army during World War II although he was Jewish; he committed "very gruesome acts" during the Hungarian Revolution; his parents died of cancer and suicide; he divorced his first wife; he kept his Jewish heritage a secret; and he kept multiple firearms in his house after emigrating to the United States because he was afraid Nazis would kill him and his family. Morva also faults trial counsel because they did not investigate his mother's abusive first marriage, which caused her anxiety; how Morva's father controlled and was domineering of Morva's mother; the experiences of the three siblings, nieces, and nephews of Morva's mother;[25] the relationship between Morva's mother and maternal grandmother; and Morva's maternal grandmother's nervous breakdown, schizophrenia, three-month hospitalization, mean demeanor, and alcoholism.

In claim IX(B), Morva argues that trial counsel did not provide available information to the mental health experts to ensure an accurate and reliable mental health evaluation. Specifically, Morva faults trial counsel for not disclosing to Drs. Cohen and Bender, the two appointed mental health experts, the details of trial counsel's interviews with Morva's friends and family or the friends

---

[25] Allegedly, one sibling suffers from schizophrenia, the second sibling suffers from obsessive compulsive disorder and has struggled with depression, the third sibling married a cheating man, and several nieces or nephews have alcohol and drug addiction problems and obsessive compulsion disorder. Id. at 116.

69

and family's contact information.  Id. at 128-29.  Morva further faults trial counsel for not

"obtain[ing] information from friends and family about the symptoms of Morva's apparent descent

into mental illness, which, if reviewed by the trial experts, would have raised 'plenty of "red flags"

pointing' to a more serious mental illness."  Id. at 121.  Morva alleges that reasonable counsel would

have investigated these people more and provided that information to the appointed experts and

that, had trial counsel done so, "there is a reasonable probability that the mental health experts

would have made an Axis-I diagnosis" of, "most likely[,] schizophrenia, obsessive compulsive

disorder, and/or delusional order[,]" instead of an Axis-II personality disorder.  Id. at 129, 135.

     In claim IX(C), Morva argues that trial counsel did not adequately present all available

mitigating evidence during the sentencing phase.  Specifically, Morva alleges that "competent

counsel would have been able to explain to the jurors how Morva's criminal actions were directly

related to and a product of [a delusional disorder]—a circumstance far beyond his control that

diminishes his moral culpability."  Id. at 140.

     The Supreme Court of Virginia dismissed these arguments on habeas review, finding no

deficient performance or resulting prejudice.  The Supreme Court of Virginia concluded:

> The record, including Morva's exhibits, demonstrates that counsel
> conducted an exhaustive investigation and spoke with the witnesses
> upon whose affidavits Morva now relies.  These affidavits contain
> vast amounts of negative information that shows Morva as self-
> absorbed, manipulative, aggressive, and uncaring.  As such, testimony
> from these witnesses would have been "double-edged."
> Furthermore, Morva has not demonstrated what impact, if any, his
> parents' upbringings had on his actions.  The information about his
> parents that Morva now provides does not concern Morva's personal
> background or history, or the circumstances of the offense, and does
> not mitigate Morva's actions.

* * *

70

> Morva proffers no competent evidence to substantiate his claim that he suffered from a "true mental illness," or that providing additional information to the mental health experts who examined Morva in preparation for trial and sentencing would have changed the experts' conclusions.

Morva v. Warden, 285 Va. at 521, 522-23, 741 S.E.2d at 789, 790 (internal citation omitted).  After reviewing the record, the court finds that the Supreme Court of Virginia's adjudication of claim IX was not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts.

First, as to claim IX(A), as the Supreme Court of Virginia recognized, Morva's father's exposure to Nazi-occupied Hungary and Soviet repression following the 1956 Hungarian Revolution has nothing to do with this case and could not serve to mitigate Morva's crimes.  Rather than focus on history Morva never experienced and a country Morva never visited, trial counsel presented testimony from a number of witnesses who knew Morva and explained that he was an easy-going, compassionate, free spirit who was friendly, polite, and likeable.

For example, Michael Delpercio, one of Morva's former high school teachers, testified that he spent time with Morva alone after class discussing Morva's wide-ranging interests.  Morva "reminded [Delpercio] of a hippie sort of.  Kind of easy-going, liberal type, you know, like to discuss, you know, broad kind of liberal issues sort of."  Direct Appeal JA at 2193.  Describing Morva as "real, kind of passivist," Delpercio saw no signs of violence in Morva, and testified that he caused no trouble in class.  Id. at 2193-95.  Their relationship was such that Morva "would discuss problems that he had with me.  And I knew he had, I got the impression he had some problems with his father, and there was some issues about moving and what his mother wanted."  Id. at 2194.

71

Debbie Campbell, a former high school guidance counselor, testified that Morva appeared to be "respectful[,]" "very polite and friendly[,]" "a bright and likeable young man[,]" and a "free spirit type personality" who was not a "troublemaker." Id. at 2200, 2203, 2205. Campbell related that, even after Morva dropped out of high school, she saw Morva in downtown Blacksburg periodically and that he seemed to be "the same as in high school[:]" polite, friendly, and articulate. Id. at 2204-05.

Maria Rott, a high school friend, testified that Morva was "always very, very caring[,]" concerned about the plight of minorities, "compassionate towards people who were having a hard time," "cared a lot about nature and animals," and was interested in the outdoors. Id. at 2209. Rott testified that "William was always there to stand up for friends of his. I remember a number of times just, you know, he would just be a comfort. And every time that you would see him, if I would see him downtown, he always had a big smile when he greeted me and a big hug." Id. at 2210. Rott described how Morva would engage other people at the local coffee shop in conversation: "William is not afraid to talk to anybody. I always thought it was fun to see what he was thinking about or what topic, you know, he had read about. He was very interested in a lot of things. I remember some interesting conversations about Native Americans, his concern for their, what they're going through in this country, and some of those issues." Id. at 2212. Rott also saw no signs of violence in Morva, describing him as "fervently against guns. He was always very, he would always stick up for his friends, but never in a violent way." Id. at 2214. Rott recalled that Morva "missed a fair amount of school because of health" and that she talked to him about his stomach problems and very restricted diet. Id. at 2213-14.

Kyla Trice, another high school friend, testified that Morva "has always been one of the best people [she's] ever known," who "was the type of person to give you a hug on a bad day" and a "great person to have around." Id. at 2220, 2222. Trice explained that she never knew Morva to be violent and was shocked to hear of the charges against him. Id. at 2223, 2228.

Anna Burkhart, another high school friend, testified that Morva was "a very sweet, open, and intelligent person. A very sensitive person also, and a very good friend to me." Id. at 2233. Burkhart testified that she knew Morva well, often spending time together. Burkhart testified that Morva's family relationship was "tumultuous and difficult[,]" "especially with his father as so many people do growing up[,]" but that she never saw any violence in him. Id. at 2236. As with other friends, Burkhart testified that she knew Morva suffered from stomach problems. Id. at 2238. Burkhart also explained that she knew Morva was homeless after he dropped out of school and his family moved to Richmond and that he either stayed with friends or acquaintances or camped in the woods. Id. at 2238-39.

Emily DeBoard, another high school friend, spoke of the time Morva helped her pick up her school books and papers that had tumbled from her backpack, while others pointed and laughed. Id. at 2251. DeBoard described Morva as fun-loving and quiet, not a troublemaker. Id. at 2252. DeBoard described seeing Morva help a woman struggling with bags to cross the street in downtown Blacksburg and observing Morva in a local coffee shop discussing that he wanted to move to the Dakotas to document living with Native Americans. Id. at 2253-54.

Eric Spinrad testified that Morva was "one of the first people that opened up to me and made [Blacksburg] enjoyable." Id. at 2257. Spinrad testified that Morva was concerned that his mother was living out of a car and that he was "decentered" after his father's death. Id. at 2257-58,

73

2260. Spinard testified that Morva would bring up his father in conversation, noting that Morva had "a lot of respect for his father. I mean no parental situation is perfect but there is a love for family there." Id. at 2258. Spinrad testified that Morva drifted around Blacksburg for a period, staying with him or with other friends, and mentioned his digestion issues, terming his stomach "active." Id. at 2258-59. Spinrad described Morva as a "very helpful guy" and that he had "a lot of respect for everything he's done for me." Id. at 2260.

Aaron Grisby, who worked at the local coffee shop Morva frequented, "knew him as a very kind and caring person, very sincere. Probably one of the most sincere people I knew in Blacksburg. Always very friendly. Always willing to talk and listen with just about everybody he met." Id. at 2273. Grisby told the jury about Morva's struggles with his diet and digestive issues, and that he never knew Morva to be violent. Id. at 2272-73.

In support of his claim that trial counsel conducted an inadequate investigation, Morva's state habeas appendix contained affidavits from additional persons who attended high school with Morva or knew him in Blacksburg. By and large, these affidavits repeat the same information or themes about Morva that were presented to the jury during trial, i.e., that Morva was a compassionate, friendly person who, over time, drifted into increasingly eccentric beliefs and behaviors. Dr. Cohen's report and testimony factored these attributes of Morva's character into the psychiatric assessment developed in mitigation. The fact that trial counsel did not call additional witnesses to cumulatively testify that Morva was a friendly, wayward soul, wandering barefoot around Blacksburg and obsessed with the plight of Native Americans or other causes does not constitute deficient performance or establish prejudice. See Wong v. Belmontes, 558 U.S. 15, 22-28 (2009) (rejecting the notion that more cumulative evidence is always better, especially when "the

74

notion that the result could have been different if only [the defendant] had put on more than the nine witnesses he did, or called expert witnesses to bolster his case, is fanciful"). The factual evidence presented at sentencing by trial counsel was designed to paint Morva in a sympathetic light and support the expert psychological and psychiatric testimony. Simply because cumulative testimony could have been presented does not render the trial strategy and development of trial evidence ineffective. The simple reality is that Morva had not been diagnosed with any mental health issues or received any mental health treatment prior to the murders, and it cannot be credibly argued that trial counsel were ineffective or Morva prejudiced because trial counsel did not present additional witnesses as to Morva's eccentricities. The jury heard substantial evidence as to Morva's personality and behavior, two mental health experts testified that he suffered from a schizotypal personality disorder, and trial counsel cannot be faulted because the jury did not find it to be sufficiently mitigating. Accordingly, claim IX(A) must be dismissed.

As for claim IX(B), Morva faults trial counsel for not disclosing to Drs. Cohen and Bender the details of trial counsel's interviews with Morva's friends and family or their contact information.[26] Based on the information from trial counsel, Dr. Cohen, the forensic psychiatrist, interviewed Morva's mother, Elizabeth Morva, and Morva's sister, Emily Happel.

Morva's habeas petition asserts that his mother was partly responsible for the squalor and abuse Morva allegedly experienced, and Emily Happel allegedly experienced the same environment.

---

[26] Although Morva faults trial counsel for not communicating "available information" to both Dr. Cohen and Dr. Bender, Dr. Bender's report was based on information from Morva during an interview and neuropsychological testing. Direct Appeal JA at 2289-91. Dr. Bender did not need other people's contact information as part of his psychological testing and expert analysis. Moreover, both Dr. Cohen and Dr. Bender were aware that Morva's "[f]amily history is reportedly positive for schizophrenia in his grandmother[,]" and Dr. Cohen testified during trial that Morva's maternal grandmother was hospitalized for three months in the 1950s for possible schizophrenia. SHA Vol. 6, at 2468, 2483; Direct Appeal JA at 2349.

75

Elizabeth Morva acknowledged in her affidavit that Dr. Cohen "mostly asked me questions about my family and our background," yet she did not discuss the squalor and abuse Morva claims he experienced or her relatives' infirmities.[27]  Furthermore, Emily Happel acknowledges that she told Dr. Cohen that Morva "was a pretty normal kid."  SHA Vol. 1, at 474, ¶ 3.  Despite not recounting the allegedly depraved childhood, as described in Morva's petition, to trial counsel or in her affidavit, Morva's sister admits she told Dr. Cohen about the changes she saw occur in Morva over the years, including Morva's paranoia, how Morva looked and acted like a "rabid dog" before she kicked him out of her house, and the changes Morva experienced right before he escaped.  SHA Vol. 1, at 479, ¶ 27, 483, ¶¶ 46-47.  Even Morva acknowledges in his petition that Elizabeth Morva and Emily Happel "were capable of giving the experts information regarding Morva's childhood and adolescence," but it is apparent that, despite the opportunity, neither of them told Dr. Cohen about the negative environment Morva asserts he experienced while growing up in the Morva household.  Trial counsel cannot be faulted because Morva's family members did not report the circumstances of Morva's childhood in a manner consistent with his petition.

Morva also faults trial counsel for not contacting Morva's brothers, Nat or Michael, or providing their contact information to Dr. Cohen.  However, Dr. Cohen learned when he interviewed Emily Happel that Morva had lived with his brother Nat in Richmond, Virginia, for a period of time and that Michael had moved back to Blacksburg to live with Morva.  Dr. Cohen

---

[27] Notably, Elizabeth Morva admits that trial counsel asked her about Morva's mental health and family background at the very beginning of legal representation.  SHA Vol. 1, at 130, ¶ 164.  She averred that trial counsel could not use claims of mental illness as Morva's defense strategy "because there was no documented history of him having a mental illness prior to the murders.  In particular, they said they needed medical records."  SHA Vol. 1, at 131, ¶ 168.  However, the record makes clear that there were no mental health records to obtain because Morva did not receive mental health treatment before the murders.

could have obtained or requested Nat's or Michael's contact information without any assistance from trial counsel, either on his own initiative or from Elizabeth Morva or Emily Happel.[28]  It cannot be credibly contended that trial counsel were responsible for not providing Dr. Cohen with Nat's or Michael's contact information when Dr. Cohen knew of the brothers and could have obtained their contact information from other sources as he deemed necessary in formulating his opinion.[29]

Morva particularly faults trial counsel for conducting only cursory interviews with some of the people who gave statements to state habeas counsel, including, most importantly, Qato Burkhart, Mark Williams, and Father James Arsenault.  Trial counsel spoke with Qato (formerly Anna) Burkhart for two hours at a hotel in Raleigh where trial counsel inquired about Morva's mental health.  SHA Vol. 1, at 407-43.  Burkhart testified at trial.  Trial counsel also spoke to Morva's friend, Mark Williams.  Both in a police interview and in his state habeas affidavit, Williams described Morva, armed with his father's pistol, "pretending he was being attacked and defending himself . . . . He thought the system was going to come after him, violently."  SHA Vol. 1, at 343, ¶ 53.  Trial counsel told Williams "that they could not use me because I knew things about Will's

---

[28] Although Nat filed an affidavit in support of the state habeas petition, he, too, does not detail the allegedly depraved childhood Morva's petition claims he experienced or his extended family's infirmities.

[29] Nonetheless, testimony from Morva's two brothers was unlikely to change the outcome.  Michael had been arrested in 2005 along with William on the burglary and robbery charges, and his affidavit is otherwise patently incredible.  See, e.g., SHA Vol. 1, at 377-78, ¶ 39, 379-80, ¶¶ 45-47, 382, ¶ 57, 387, ¶ 75; see also SHA Vol. 3, at 1205-17, 1220-22 (describing Michael Morva's behavior in 2006 and 2007), SHA Vol. 7, at 2654 (same).  His testimony could not have helped Morva.  The only notable information described in Nat's affidavit is how his relationship with Morva disintegrated.  SHA Vol. 1, at 73, ¶ 23.  According to Nat, Morva left pornographic images on Nat's home computer that were discovered by Nat's four year old son.  When Nat chided Morva, Morva became "very angry" and acted like Nat was throwing him out of the house.  Again, this testimony could not have been helpful to Morva's defense.  In short, it cannot be maintained that an interview by Dr. Cohen of Nat or Michael Morva could have changed his diagnosis or had any reasonable probability of affecting the outcome.

feelings about the police and fighting back." Id. at 347, ¶ 69. Father James Arsenault did not meet Morva until after the murders. Father Arsenault testified at trial that he saw Morva almost every week at the New River Valley Jail and that Morva was "very respectful, and polite, and very mindful too of his language." Direct Appeal JA at 2282. In short, trial counsel spoke to each of these witnesses and two were called as mitigation witnesses at trial. Trial counsel cannot be faulted for not calling Mark Williams to testify and risk him recounting Morva practicing violent encounters with police. There is no substance to the assertion that trial counsel shirked their obligation to interview and call these persons to testify for Morva at trial.

Jack Bennett noted in his affidavit that Morva "was the local eccentric and everyone in town has a William Morva story." SHA Vol. 1, at 184, ¶ 3. To be sure, trial counsel could have persisted in trying to talk to anyone in Blacksburg who had a "William Morva story." The affidavits in the state habeas record reflect, however, that, had trial counsel continued to investigate everyone who met Morva in Blacksburg, the information would be cumulative or not otherwise probative of new mitigation evidence that had a reasonable probability to change the outcome.

As for claim IX(C), Morva complains that Drs. Cohen and Bender would have had access to more information that "would have raised 'plenty of "red flags" pointing' to a more serious mental illness" had trial counsel forwarded more contact information of Morva's acquaintances from Blacksburg. But Dr. Cohen already had sufficient information to diagnose Morva with schizotypal personality disorder. Indeed, Dr. Cohen based his diagnosis on the very sort of information contained in the affidavits included in the state habeas record. In his evaluation, Dr. Cohen states:

> Mr. Morva recalled his father as having been very opinionated over issues related to politics and religion. He strongly believed in religious and political diversity and was opposed to excessive government control. His father sometimes came into conflict with

78

his mother over issues of religion . . . . Mr. Morva denied any history of childhood abuse, but he did report (and his mother confirmed) that his father was . . . very opinionated, became angry very easily, tended to insult the children and was a strict disciplinarian [who] would slap Mr. Morva or his siblings even for minor infractions. Despite this (and perhaps because of this), Mr. Morva came to see himself as a free-thinker who "wouldn't be tamed" by his father.

The family moved to Blacksburg when Mr. Morva was 14 years old, the summer before he started high school. Mr. Morva recalled having been intelligent but despite this having performed extremely poorly in school ever since elementary school. "I failed almost all of my classes." Despite this, he did not recall having been referred for educational testing or counseling, never was evaluated for a learning disability or attention problem, and was allowed to progress to the next grade despite his poor grades. His mother, in a separate interview, confirmed that this was the case. His school records also indicate that he received C's, D's, and F's throughout school career. He did not get into fights, use alcohol or drugs, or demonstrate other behaviors suggestive of a conduct disorder. However, he did demonstrate limited attention, motivation, and attendance and would get into arguments with his teachers. He ultimately dropped out of school at age 18, during his senior year of high school. A report at the time that he dropped out from a high school by a school [guidance counselor] commented: "He is a bright and likeable young man. His free spirit type personality did not mesh with the school setting . . . ."

During the present evaluation, Mr. Morva described a complex belief system centering on his physical health. He recalled having felt "sick," "exhausted," and "unable to concentrate" throughout his school years, due to both chronic sinus infections and irritable bowel symptoms. With regard to the latter, Mr. Morva described becoming extremely constipated and having to repeatedly spend hours on the toilet with very limited results, even after taking stool softeners or laxatives. He reported that it was only after high school that he discovered on his own that by drinking more fluid, avoiding processed foods, and in particular living a more "natural" lifestyle (e.g., eating mostly meat and nuts and camping out in the woods, as the American Indians used to do) that his energy and digestive complaints dramatically improved. He assumed that during his childhood he'd had a hyperactive immune system that only now had calmed down.

79

. . . . However, there is no record of his having been treated for irritable bowel symptoms until late adolescence, with his attorneys having only been able to locate a single medical consultation note from October 2003, at which time Mr. Morva told the physician that his symptoms had been present for "several years." Mr. Morva's mother did not recall him having experienced bowel difficulties during his childhood and she felt certain that such symptoms were something that she likely would have noticed. Therefore, it appears likely that Mr. Morva's preoccupation with his bowel function and with the impact of nutrition on his overall health likely began during his late teenage years.

. . . . [W]hen Mr. Morva was 18 years old his parents returned to the Richmond area . . . . Mr. Morva asked to stay in Blacksburg where he had friends and where he hoped to find a job and support himself. His parents agreed to this plan. Until their house sold about one year later, Mr. Morva remained there, but it also was during this period that he began going on extended camping expeditions into the Jefferson National Forest. After the house sold, he alternated between living in the woods, living in a rented apartment, or staying with friends.

Mr. Morva stated that starting at about age 19, he would go into the woods, at first bringing along typical camping supplies but later learning how to live completely naturally, e.g.[,] by making his own survival tools (including making his own bow and arrows in order to hunt deer), making his own shelter from rocks and skins, and making his own soap from deer fat. In the woods, he felt healthier than he'd ever felt, subsisting primarily on a diet of deer meat and nuts. He described having learned such techniques from his own experience, supplemented by some reading of library books. He denied being a loner or recluse, and in fact stated that he typically came out of the woods after about two weeks and then for the next several months would live in town, usually staying with various friends. He added that he often invited people to come into the woods with him to share this profound experience, but people never took him up on it. He spent a great deal of time hanging out at local establishments, particularly Bollo's coffee house, usually with an open shirt and without shoes. He said that he went barefoot for philosophical reasons, since humans weren't designed to wear shoes, as well as to toughen the soles of his feet for when he was out in the woods. He also seems to have enjoyed the attention that this brought him (with people referring to him as "Barefoot Will.") He did, however, carry

80

around a pair of shoes with him for when he went into establishments that required him to wear them.

* * *

Mr. Morva's impression was that he had acquired a reputation around Blacksburg as "that cool guy who hangs out all of the time." Police interviews, defense interviews, and newspaper interviews with a variety of Blacksburg locals describe Mr. Morva as having appeared to them to be immature and egotistical (claiming to be an expert in almost anything being discussed, and going into extended diatribes about a variety of subjects). They tended to humor him, couldn't say for sure how much of his stories were fact or fiction, and generally viewed him as a harmless eccentric.

Mr. Morva denied that there had been any change in his personality or social functioning throughout his life. However, his mother and sister had different perceptions of this. They indicated that [as] a child he had been gentle and shy but that at about age 16 or 17 he had started acting differently. He didn't appear to them to have been depressed, and he did have some friends, but he tended to spend more and more time alone . . . . His mother did not recall Mr. Morva ever having been grossly delusional, but she did recall him intermittently making[ ] comments to her such as, "I know things that nobody else knows, and I don't know how I know them." He never fully explained such comments to her. She did suggest to him in his late teenage years that he might benefit from seeing a therapist, but he became annoyed with this suggestion, and she didn't pursue it further.

His mother further recalled that in April 2004 Mr. Morva's father died and Mr. Morva coped poorly with this. He arrived at the funeral without shoes, disheveled, and in shabby clothing. He was very disorganized in his thinking and behavior. His mother reported that his thought processing itself was quite disorganized, to the point where she couldn't fully understand what he was talking about. He spoke at length about the plight of the American Indian. He was extremely intense in his demeanor, and at one point he grabbed her arm and said, "Are you listening to me? This is important, that's why I have to train." He also was preoccupied with the belief that "there's no good or bad. For example, most people think being hit by a truck would be a bad thing, but it's just a different experience."

81

* * *

Mr. Morva's sister recalled him as having become increasingly rigid and intense in his thinking from about age 19 through 21. He could have a bland demeanor during conversation but then might abruptly become loud and angry, depending on the topic being discussed. She didn't recall him as having become frankly delusional, but at times he would make[ ] statements that had a paranoid and/or grandiose flavor, such as when in about 2001 he told her that the Blacksburg police "hate me, they're following me, they won't let me go." This was at about the same time that he had started going out into the woods and had begun his "all-natural" diet.

* * *

His sister further recalled that throughout the funeral, which was indoors, Mr. Morva preferred to stay outside by himself. Later, in her home, Mr. Morva became furious in discussing his brother Michael's plans to join to the Marines and fight in Iraq. Mr. Morva insisted that Al Queda [sic] "must have had a reason for what they did, and if you have a reason, it's not wrong.[ ] There is no right and wrong." He became so loud, angry, and intense ("like an animal") that she became concerned for her children's safety and asked him to leave.

* * *

. . . . Mr. Morva's friend Mark Williams came forward and reported that he'd known Mr. Morva for three years and had been his roommate until Spring, 2005. Mr. Williams also stated that he'd observed a marked change in Mr. Morva following his father's death, around January 2005. Mr. Morva had brought a handgun back that had belonged to his father and had become extremely concerned over the dire financial straits his mother had been put in. (This is not something that his mother reported to me having been concerned about following her husband's death.) According to the police report of Mr. Williams' comments: "Will appeared consumed in violent fantasy and began talking about criminal activity. When he (Mr. Williams) observed him practicing for a confrontation with 'police' in the living room of the apartment (moving furniture and practicing shooting stances/positions), he asked him to move out." Mr. Williams added that he had overheard comments by Mr. Morva related to possible robberies, but he had "felt that Will's disclosures were still just fantasy and that he'd never act upon them." Other witnesses (e.g. Nisha Thuruthy) also reported that Mr. Morva had made comments related to having engaged in local thefts, but again there were such fantastic features to Mr. Morva's stories and such an

82

> element of bragging (e.g., he said that he used magnets to disable
> various alarm systems and that he knew how to "cut the wires" to
> any security system, and he added that he was too smart to get caught
> as the local police were "stupid"), that Ms. Thuruthy also had
> assumed that Mr. Morva simply was making up stories.
>
> * * *
>
> Mr. Morva is a person of above average intelligence who – despite his
> intelligence – has failed to achieve what might have been expected of
> him in all areas of his life, including educationally, occupationally, and
> in his relationships with other people.  Beginning in his mid-teenage
> years, he developed several intense preoccupations, primarily
> involving his physical functioning, his belief that he is fundamentally
> different from other people, his desire to lead an "all-natural"
> lifestyle, and his distrust of others.  He is extremely rigid with regard
> to his personal beliefs and he has difficulty seeing things from the
> point of view of others.

SHA Vol. 6, at 2468-74.  In short, Dr. Cohen's evaluation fairly captures the essence of the volumes

of information collected in the state habeas record, and it cannot be credibly argued that trial

counsel were ineffective for not providing him with additional contacts or that there was a

reasonable probability that such additional information could have changed the outcome.

Finally, Morva argues that Dr. Cohen's diagnosis of schizotypal personality disorder did not

go far enough and that a proper investigation would have yielded a more serious Axis-I diagnosis of

delusional disorder, persecutory type.  In that regard, Morva relies on the subsequent reports from

Drs. Dale G. Watson, Ph.D., and Leslie Lebowitz, Ph.D., submitted to the Supreme Court of

Virginia, but not considered by the court or made part of the state habeas record, and from Dr.

Donna Schwartz-Watts, M.D., filed in connection with the federal habeas petition.[30]  Morva argues

---

[30] The affidavit of Dr. Watson and an unsworn opinion from Dr. Liebowtiz are appended to Morva's second amended
petition.  As their submissions reflect, neither Dr. Watson nor Dr. Liebowtiz met Morva.  As such, neither of them was
in a position to evaluate or diagnose Morva.  Upon review of information collected in the state habeas appendix, Dr.
Watson averred that he saw "evidence that Mr. Morva holds delusional beliefs," and that "a mental health evaluation of

83

that such available but unpresented mitigation evidence "'might well have influenced the jury's appraisal' of . . . culpability[.]" Rompilla v. Beard, 545 U.S. 374, 393 (2005) (quoting Wiggins v. Smith, 539 U.S. 510, 538 (2003), and Williams v. Taylor, 529 U.S. 362, 398 (2000)). The court cannot agree.

Based on scientific testing that he performed, Dr. Bender testified that Morva had weakness, or cognitive dysfunction, in executive functioning, which he described as "your ability to plan, organize your thoughts, to switch from one thing to the other fairly efficiently and effectively, to hold things in your memory temporarily as you work through a problem, [and] problem solving itself." Direct Appeal JA at 2293. Dr. Bender testified that the results of his neuropsychological testing were consistent with schizotypal personality disorder. Id. at 2294. He stated, "individuals with such a diagnosis of schizotypal personality disorder tend to show this same pattern of dysfunction on neuropsychology testing." Id. at 2294. Dr. Bender also testified that his evaluation and testing of Morva did not indicate any malingering or attempt to fake a condition. Id. at 2297, 2311-13.

Dr. Cohen interviewed Morva several times over the course of a year, several hours at a time. Dr. Cohen also interviewed Morva's mother and sister and reviewed police, jail, school and medical records, and the neuropsychological testing performed by Dr. Bender. In mitigation, Dr.

---

Mr. Morva is necessary at this time in order to ascertain accurately whether he suffers from an Axis I disorder because none of the prior evaluators were fully aware of Mr. Morva's history as detailed above." Appendix to Morva's Second Am. Pet., Dkt. No. 111-1, at 83, 85. Dr. Liebowitz, a licensed clinical psychologist whose work has focused on the long-term effects of exposure to trauma and the treatment of traumatic stress reactions, reviewed Dr. Watson's affidavit and a multi-generational genogram. She stated that "Mr. Morva most likely has a history of exposure to serious traumatic events, that these events likely affected his development, and that a complete evaluation by a clinician with special expertise in the field of traumatic stress or child maltreatment would be necessary to a meaningful understanding of Mr. Morva's behaviors and actions as an adult." Id. at 107-08. The submissions by Drs. Watson and Liebowtiz were provided to the Supreme Court of Virginia as part of Morva's effort to obtain another mental health evaluation. As such, neither of these submissions constitutes a mental health evaluation or diagnosis for Morva.

84

Cohen testified that he found in Morva "evidence of a disorder called schizotypal personality disorder. That was to my mind, the primary factor in looking at him that one could consider to be a quality in the history or his character that might relate to the offenses." Id. at 2325. Dr. Cohen explained that the DSM-IV recognized the schizotypal personality disorder diagnosis and that his opinion that Morva suffered from this condition was rendered to "a reasonable degree of psychiatric certainty." Id. at 2383. In fact, Dr. Cohen testified that while the DSM-IV allowed a schizotypal disorder diagnosis if five of nine symptoms were present, Morva had "[p]ossibly all nine, but at least eight of them." Id. at 2328. Dr. Cohen described schizotypal personality disorder as having "features that it shares with schizophrenia." Id. at 2330. "With schizotypal personality disorder, you don't see overt hallucinations or delusions or severely disorganized thinking, and the person isn't as clearly out of contact with reality, but you can see evidence of manifestations that are similar but more subtle." Id. at 2331. Dr. Cohen testified at length regarding the manifestations of this disorder in Morva, including his delusions of reference, odd beliefs, unusual perceptual experiences including bodily illusions, odd thinking and speech, suspiciousness or paranoid ideation, inappropriate or constricted affect, odd behavior or appearance, and lack of close friends or confidants. Id. at 2331-41. Dr. Cohen testified that this disorder usually manifested itself in the teenage years and can become more severe into a person's twenties. Id. at 2343. Dr. Cohen had no concern that Morva was malingering. In fact, Dr. Cohen testified that "Mr. Morva's main thing that he wanted to persuade me of . . . was how intelligent he was and how he had the answers for everything. And he was basically opposed, he really had real concerns about my testifying even today if it was going to paint him in a light of a person who might have some sort of mental impairment." Id. at 2344-45. Dr. Cohen testified about the significant role genetics plays in the

85

development of one's personality and the fact that there is a higher rate of schizotypal personality disorder "where you know one person in the family has a diagnosis of schizophrenia." Id. at 2348-49. Dr. Cohen noted the fact that Morva's grandmother was hospitalized in the 1950s for possible schizophrenia. Dr. Cohen concluded:

> [H]e does appear to have a condition that we know has a basis in genetics. Sure it doesn't mean that your genes determine everything that you do, but it plays a role in shaping who we are, your family background and the genes that you come to life with. He also has a way of seeing the world that one could say is not fully in his control, it's kind of a reflection of who he is. It doesn't mean that he couldn't have potentially chosen to do otherwise, but this is a factor that influences how he sees the world and how he acts. So the way he saw his jail setting when he was sitting in it, the way he felt he was treated in the jail, the way he felt that the jail conditions were unbearable, even though there's lots of inmates who are on the same jail block as him who aren't trying to escape. His personality and the way he views the circumstances plays a role in helping to understand, not excuse, but helping to understand how he ended up acting the way he did.

Id. at 2353-54.

Morva argues that counsel failed to provide adequate information to Drs. Bender and Cohen and that competent counsel would have done investigation sufficient to obtain a diagnosis of a more serious delusional disorder. Morva argues that:

> [E]quipped with a diagnosis of delusional disorder, a major mental illness and a DSM V Axis I disorder, and the family and social history and symptoms supporting the diagnosis, competent counsel would have been able to explain to the jurors how Morva's criminal actions were directly related to and a product of his mental illness – a circumstance far beyond his control that diminishes his moral culpability . . . . In addition, rather than Morva's violence being the product of a depraved and evil mind, trial counsel could have had a explanation for the jury that Morva's mental illness was a but-for cause of the violence, reducing his moral culpability and providing a strong argument for life in prison rather than a death sentence.

86

Second Am. Pet., Dkt. No. 111, at 140.[31]

The court cannot agree. First, the evaluation done by Dr. Donna Schwartz-Watts in 2014 comes many years after the trial and the evaluations done by Drs. Bender and Cohen.[32] Dr. Schwartz-Watts' 2014 evaluation cannot be used as a basis to attack the adjudication of the state habeas claims. See Cullen v. Pinholster, 563 U.S. __, 131 S. Ct. 1388, 1398 (2011). Moreover, Morva has made no showing that Dr. Schwartz-Watts' diagnosis of a delusional disorder in 2014 could have, or would have, been rendered by the trial experts in 2008 had they been presented with the evidence Morva claims was not adequately pursued. Indeed, Dr. Cohen explained in great detail the aspects of Morva's life that led him to form his diagnosis that Morva suffered from a schizotypal personality disorder and that Morva's disorder "influences how he sees the world and how he acts." Direct Appeal JA at 2328-41, 2354. In short, Dr. Cohen presented to the jury expert psychiatric evidence in mitigation of Morva's actions, which the jury weighed. The evidence from Dr. Schwartz-Watts' 2014 evaluation – that Morva's conduct should be mitigated by the diagnosis of a delusional disorder as opposed to a schizotypal personality disorder – is founded on the same attributes of Morva's personality and behavior that Dr. Cohen presented to the jury. To be sure, there is a difference in degree. But it has not been established that Dr. Cohen's opinion would have been any different had he been presented with the additional information Morva argues trial counsel should have provided.

---

[31] DSM-V was published in 2013, superseding the version in use during Morva's trial.

[32] As noted previously, neither Drs. Watson nor Liebowtiz, who provided opinions in support of state habeas counsel's request for another mental health evaluation of Morva, were in a position to diagnose Morva, although each were of the view that a comprehensive evaluation should be undertaken.

87

In short, Dr. Cohen was able through his testimony to describe to the jury, based on his hours of interactions with Morva, his interviews with Morva's mother and sister, his consideration of Dr. Bender's testing, and his review of records, that Morva had a recognized mental disorder that played a role in "his thinking, his feeling, his behaviors." Direct Appeal JA at 2387. The evidence developed in the state and federal habeas petitions do not portray a different picture of William Morva – rather they simply serve to put a different DSM label on the same attributes of Morva's personality and behavior that Dr. Cohen testified to at trial. As such, the court cannot conclude that there is a reasonable probability that the outcome would have been different had Dr. Cohen been provided the additional information Morva now suggests was lacking. Trial counsel presented expert psychiatric evidence based on many hours of evaluations of Morva done by Drs. Bender and Cohen over the course of the year before trial. There is no basis to suggest that trial counsel were in any respect ineffective in presenting this expert testimony in mitigation.

Morva relies principally on Rompilla v. Beard, 545 U.S. 374 (2005), but the deficiencies of counsel there were not present here. In Rompilla, the defense put on "relatively brief testimony: five of his family members argued in effect for residual doubt, and beseeched the jury for mercy, saying they believed Rompilla was innocent and a good man." Id. at 378. Post-conviction counsel "identified a number of likely avenues the trial lawyers could fruitfully have followed in building a mitigation case." Id. at 382. The Court noted that while "there is room for debate about trial counsel's obligation to follow at least some of those potential lines of enquiry," id. at 383, it was clear and dispositive that "the lawyers were deficient in failing to examine the court file on Rompilla's prior conviction," id., which the prosecution used in aggravation. No similarly egregious failing can be attributed to Morva's trial counsel.

88

Nor is this a case like Wiggins v. Smith, 539 U.S. 510 (2003), where counsel did not pursue mitigation evidence beyond that contained in the presentence report and department of social service records and introduced no evidence of Wiggins' life history. Morva's witnesses, lay and expert, painted a rather clear picture as to Morva's character and behavior. That the jury did not find it to be sufficiently mitigating cannot be blamed on trial counsel's efforts.

This case is a far cry as well from Williams v. Taylor, 529 U.S. 362 (2000), where trial counsel did not prepare for sentencing until a week before trial, did not conduct "an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood," id. at 395, and "failed to introduce available evidence that Williams was 'borderline mentally retarded' and did not advance beyond sixth grade in school." Id. at 396.

Finally, this case does not begin to resemble Porter v. McCollum, 558 U.S. 30 (2009), where the defense did no investigation and put on no evidence concerning Porter's mental health although he was subject to abuse as a child, suffered from a brain abnormality, and was traumatized by combat exposure in the Korean War to the extent that he went absent without leave twice. As the Court noted, "[t]he judge and jury heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability." Id. at 41.

Here, in contrast, trial counsel investigated and presented substantial evidence in mitigation, thirteen witnesses in total, including two expert mental health professionals. Morva argues that counsel should have done more. But unlike Rompilla, Wiggins, Williams, and Porter, there is no showing that additional evidence would have been anything other than cumulative and that it is reasonably probable that the result would have been different.

> This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the

> face, cf. Wiggins, 539 U.S., at 525, or would have been apparent from
> documents any reasonable attorney would have obtained, cf.
> Rompilla v. Beard, 545 U.S. 374, 389-393 (2005). It is instead a case,
> like Strickland itself, in which defense counsel's "decision not to seek
> more" mitigating evidence from the defendant's background "than
> was already in hand" fell "well within the range of professionally
> reasonable judgments." 466 U.S. at 699.

Bobby v. Van Hook, 558 U.S. 4, 11-12 (2009).

As such, the Supreme Court of Virginia's adjudication of claim IX was not an unreasonable application of Strickland. Morva has not sufficiently shown that trial counsel conducted an inadequate investigation of Morva's background, history, character, and mental defect or that any omitted information resulted in inaccurate and unreliable mental health evaluations. None of the family members and acquaintances' affidavits run contrary to the testimony of Drs. Cohen and Bender. Morva argues that the result would have been different had the jury heard that Morva suffered from a more serious delusional disorder, as opposed to a schizotypal personality disorder, but the new diagnosis, while differing in degree, is founded on the same attributes of Morva's personality and behavior that were amply presented to the jury. The jury heard in mitigation from many witnesses who knew Morva's passive, free spirit nature and from mental health professionals that he suffered from a schizotypal personality disorder. The jury chose to impose the death penalty nonetheless, and there is nothing short of speculation to suggest the additional cumulative evidence raised in the state habeas record had any reasonable probability of changing the outcome. See Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). Accordingly, this claim must be dismissed. See Schriro v. Landrigan, 550 U.S. 465, 474 (2007) ("[I]f

90

the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

### J.   Claim X – Ake v. Oklahoma Claim

In claim X, Morva argues that trial counsel rendered ineffective assistance by not ensuring that Morva had constitutionally adequate expert assistance from Drs. Cohen and Bender.  Morva alleges that Drs. Cohen and Bender "made clear to [trial] counsel that they would maintain 'objectivity' in their involvement in the case and would not act in Morva's best interest."  Second Am. Pet., Dkt. No. 111, at 146.  Morva concedes that he was not "entitled to an expert who renders an opinion that is favorable to [him]," but argues that he was entitled to "an expert to serve an assisting or advocacy role in the identification, development, and presentation of evidence" of "Morva's history, character, background, and mental condition."  Id. at 145, 146.

Morva bases this claim on a sentence in each of the appointed experts' reports contained in an introductory paragraph entitled "Confidentiality Statement."  Dr. Cohen's report reads:

> Before beginning the evaluation, Mr. Morva was informed that this was a forensic evaluation and that I would not be acting as his personal physician.  He was informed that the goal of the evaluation would be to prepare a report that sought objectivity rather than act in his best interest.  He also was informed that this evaluation would be protected by attorney-client privilege but that a copy of the report would potentially be released to the Court and to the Commonwealth's attorney should he and his attorneys choose to use psychiatric testimony at sentencing.  He was given an opportunity to ask questions.  He demonstrated an understanding of this information and agreed to proceed with the evaluation.

91

SHA Vol. 6, at 2465. Dr. Bender's Neuropsychological Evaluation Report contained nearly identical language. SHA Vol. 6, at 2483.[33] Because of this language, Morva believes trial counsel should have objected to the experts' appointments and requested that new experts be appointed.

The Supreme Court of Virginia dismissed this claim on habeas review, stating, "Morva proffers no authority for his contention that the experts appointed to assist Morva should be biased in Morva's favor. Morva was entitled to, and received, 'access to [ ] competent' mental health experts to 'conduct an appropriate examination and assist in evaluation, preparation, and presentation of' Morva's defense, as required by Ake v. Oklahoma, 470 U.S. 68, 84 (1985)." Morva v. Warden, 285 Va. at 522, 741 S.E.2d at 790 (alteration in original).

The Supreme Court of Virginia's adjudication of claim X was not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts. Ake held that "the participation of a psychiatrist is important enough to preparation of a defense to require the State to provide an indigent defendant with access to competent psychiatric assistance in preparing the defense" when the indigent defendant's sanity is likely to be a significant factor at trial. 470 U.S. at 78, 82-83. Trial counsel requested and received not just one, but two, mental health experts to aid in the preparation and presentation of mitigation evidence on Morva's behalf.

Morva was assisted in his defense by the appointment of two mental health professionals who tested and evaluated him. Morva's experts did not testify on behalf of the circuit court, nor

---

[33] As Dr. Bender is not a medical doctor, his report does not disclaim that he was acting as Morva's personal physician. Dr. Bender's report substitutes "neuropsychological testimony" for "psychiatric testimony." Otherwise, the language in the introductory "Confidentiality Statement" of the two reports is identical.

92

were they available to the prosecution.[34]  Rather, they were appointed to assist Morva and were called by Morva's trial counsel to testify in the sentencing phase in mitigation of a death sentence. Neither <u>Ake</u> nor the Due Process Clause requires more.  Accordingly, the Supreme Court of Virginia's adjudication of claim X was not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts, and this claim must be dismissed.

### K.  Claim XI – Failure to Investigate and Present "Powerful" Mitigation Evidence That Morva Saved a Man's Life

In claim XI, Morva argues that trial counsel rendered ineffective assistance by not investigating and presenting "powerful" mitigation evidence that Morva had saved a man's life, helped the Commonwealth prosecute the man's assailant, and was subjected to harassment for doing so.  Morva believes that this information "would have provided jurors with a significantly more positive understanding of Morva's background and character and moved one or more jurors to exercise mercy and select life without parole as the appropriate sentence."  Second Am. Pet., Dkt. No. 111, at 150.

In support of this claim, Morva presented the affidavit of Dorothy Mullaney, the former wife of Kevin Grizzard.  Mullaney explained that she got to know Morva personally after Morva saved Grizzard's life.  Morva's former classmate brutally attacked Grizzard at a bar, and Morva intervened, called the police, and stayed with Grizzard, who was unconscious, until the police

---

[34] Drs. Bender and Cohen were not neutral experts appointed to assist the court and available to both sides as in <u>Powell v. Collins</u>, 332 F.3d 376 (6th Cir. 2003).  There, unlike here, the trial court denied the defense request for appointment of an independent expert to assist the defense, relying instead on the appointment of a neutral "friend of the court" psychiatrist, "i.e., one whose report is available to both the defense and the prosecution."  332 F.3d at 392.  That is not what happened here.  Two mental health professionals were appointed to assist Morva's trial counsel.  They tested and evaluated Morva and testified on his behalf at trial.  This case does not resemble the circumstances in <u>Powell</u>.

93

arrived. Mullaney was impressed with Morva's actions because Morva had not known Grizzard before the attack and had testified against the assailant at the subsequent criminal trial. Morva also presented Fitzpatrick Turner's affidavit, which discussed how Turner saw the assailant's friends hassle Morva at a local bar.

The Supreme Court of Virginia dismissed this claim on habeas review. The Supreme Court of Virginia concluded that the record established that Morva had recruited Grizzard to participate in a number of burglaries in 2005 and, thus, trial counsel could not be considered ineffective for not presenting such "double-edged" evidence. The Supreme Court of Virginia also noted that Morva did not present an affidavit from Grizzard to verify that he would have testified as Morva contends and that the affidavits Morva provided "contain hearsay statements concerning the attack and Morva's involvement." Morva v. Warden, 285 Va. at 520, 741 S.E.2d at 789.

The Supreme Court of Virginia's adjudication of claim XI was not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts. No affidavit from Grizzard appeared in the state habeas record, and Mullaney, who was not present at the attack on her former husband outside the bar, could not provide admissible testimony as to Morva intervening on Grizzard's behalf. As indicated by the Supreme Court of Virginia, the state habeas record included a police report of an interview with Grizzard. This report reads:

> Mr. Grizzard said he met William Morva approximately four years ago, when Will saved his life by fighting off two males who were literally stomping his head on the ground at Joe's Diner in Blacksburg . . . .
>
> . . . . Will admitted criminal activity and said things like the Blacksburg Police would never catch him, never take him in and never hold him because they are too stupid . . . . Will had a problem

94

with the Virginia Tech Police because he was kicked out of some Virginia Tech buildings. Will said he disliked police at Tech as they were nasty. He was caught using one of the school's bathrooms and he was not allowed on campus.

* * *

. . . . Michael [Morva, Will's brother,] said he was not involved with the robbery at Food Time. Michael said Will did that on his own . . . . Someone, maybe Michael, told him that Michael and Will used to rob ATMs in Richmond.

Will came to Mr. Grizzard to see if he wanted to make some money. This was just prior to Will getting arrested for the robbery. Will said, "I got this job. I'll call you when I'm getting ready to do the job." Will called him later from Christiansburg and wanted him to come give him a ride. Will told him he had bought a shotgun and did not want to ride the public bus with a shotgun. Will called right back and said he had a ride.

Three days before Will was caught for the robbery, Will called Mr. Grizzard and said he needed his help. Will said he needed to be picked up. Mr. Grizzard took Will to mean that he would need a ride in the future. Mr. Grizzard said he felt like if he said yes to Will, that when Will called him, he could get up in Will's face and talk him out of the crime. However, the night of the robbery of Food Time behind Kroger in Blacksburg, Will did not call him. The Food Time was not that far from Will's residence at the time. Mr. Grizzard added that he has not seen Will since three nights before that robbery.

Mr. Grizzard and Will sat on the back deck at Mr. Grizzard's house. Mr. Grizzard was mad at Will for what Will had just done at Kroger. Mr. Grizzard had taken Will to Kroger and when they returned, Will unloaded stolen groceries from underneath his shirt. Mr. Grizzard chastised Will for stealing groceries. Will spoke angrily of his family members and said it was their fault.

Grizzard noticed a change in Will from the day he saved him. It looked like he was going to do something crazy . . . .

95

SHA Vol. 2, at 741-42 (internal quotation marks omitted).  Moreover, Morva admitted to Dr. Hagan, a clinical psychologist,[35] that he regretted having testified because he did not feel Grizzard benefitted from the attacker's incarceration and that "the ends of justice" would have been better served by the attacker paying restitution and attending anger management classes.  SHA Vol. 6, at 2480.

In light of this evidence, the Supreme Court of Virginia did not unreasonably determine that testimony about Morva's relationship with Grizzard was "double-edged."  Mullaney would not have been allowed to testify about the attack because she did not witness it.[36]  Had Grizzard testified consistent with his police interview, his testimony may well have detracted from the picture the defense tried to paint at sentencing of Morva as a peaceful, free spirit.  Plainly, the decision to present the evidence reflected the exercise of trial tactics not subject to second guessing on habeas review.  Consequently, it was a reasonable application of Strickland for the Supreme Court of Virginia to characterize the exclusion of such testimony as a strategic decision; the discussion of Morva's efforts to stop and prosecute the assailant was outweighed by the prejudicial discussion of Morva's criminal behavior and belief that the assailant should not have been incarcerated.  Moreover, the totality of the evidence does not suggest there was a reasonable probability that the

---

[35] The circuit court had appointed Dr. Hagan as an expert to assist the Commonwealth with mitigation evidence, pursuant to Virginia Code § 19.2-264.3:1(F).

[36] Even had she been able to testify, Mullaney's testimony was likewise fraught with problems for the defense.  Mullaney worked with and knew victim McFarland personally because he used to walk her to her car after her shift at the hospital.  Mullaney's testimony of the considerate and gentle character of McFarland could not have benefitted Morva.

jury would have imposed life sentences had Grizzard testified about his involvement with Morva.

Accordingly, claim XI must be dismissed.[37]

### L. Claim XII – Depravity of Mind Provision of Virginia's Capital Murder Statute

In claim XII, Morva argues that the jury's finding of vileness for acts involving depravity of mind, as permitted by Virginia Code § 19.2-264.4(C), violates the Eighth and Fourteenth Amendments.[38] Morva asserts that Virginia's definition of depravity of mind is unconstitutionally vague under Godfrey v. Georgia, 446 U.S. 420 (1980). Morva asserts that the definition of depravity of mind given to the jury left them without a proper benchmark to weigh Morva's conduct.

The circuit court instructed the jury "that depravity of mind means a degree of moral turpitude and . . . psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation." Direct Appeal JA at 2409. This instruction was based on the definition of depravity of mind adopted by the Supreme Court of Virginia in Smith v. Commonwealth, 219 Va. 455, 248 S.E.2d 135 (1978). Morva argues that "[w]ithout a meaningful standard of reference for these terms, jurors cannot possibly determine whether a particular capital murder involves more moral turpitude and psychical debasement than that inherent in the definition of legal malice and

---

[37] Indeed, although trial counsel did not call Grizzard, they presented other evidence of Morva's efforts to assist others who were victims of crimes. Amber Erbschloe testified that Morva "was one of a handful of people that helped identify a man that had tried to rape and kill me in downtown Blacksburg." Direct Appeal JA at 2244. Erbschloe testified that Morva helped identify the assailant and provided that information to Erbschloe and the police.

[38] Virginia Code § 19.2-264.4(C) provides:

> The penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society, or that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim.

premeditation."  Second Am. Pet., Dkt. No. 111, at 154.  Morva concludes that, without a

"meaningful standard," the "jurors were left with a standard that could fairly be used to characterize

every murder[,]" in violation of Godfrey.  Second, Morva asserts that the evidence was insufficient

to support the jury's finding of depravity of mind.  Id. at 152.

The Supreme Court of Virginia rejected claim XII on direct review.  The Supreme Court of

Virginia concluded that murder by a single gunshot wound causing instantaneous death may

constitute depravity of mind, especially if the murder is execution style and the murderer did not

show any remorse or regret or if the murder was unprovoked.  Morva v. Commonwealth, 278 Va. at

352-53, 683 S.E.2d at 566 (citing Green v. Commonwealth, 266 Va. 81, 106, 580 S.E.2d 834, 848-49

(2003); Hedrick v. Commonwealth, 257 Va. 328, 338-39, 513 S.E.2d 634, 640 (1999); Thomas v.

Commonwealth, 244 Va. 1, 24-25, 419 S.E.2d 606, 619-20 (1992)).

In Gregg v. Georgia, 428 U.S. 153 (1976), the United States Supreme Court held that the

portion of Georgia's death penalty statute that mirrors the relevant portion of Virginia Code § 19.2-

264.4(C) was not unconstitutionally vague.[39]  428 U.S. at 201.  In reaching this decision, the Court

recognized that "there [wa]s no reason to assume that the Supreme Court of Georgia will adopt . . .

an open-ended construction" to apply the phrase "outrageously or wantonly vile, horrible or

inhuman, in that it involved torture, depravity of mind, or aggravated battery" to all murders.  428

U.S. at 201.  As determined in Gregg, the wording of Virginia Code § 19.2-264.4(C) is facially valid,

---

[39] The relevant portion of the Georgia statute read, "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim."  428 U.S. at 210 (quoting Ga. Code § 27-2534.1(b)(7) (1978)).

and Morva fails to establish that Virginia Code § 19.2-264.4(C) was unconstitutionally applied as in Godfrey.

Revisiting the holding of Gregg four years later in Godfrey, the United States Supreme Court determined that the Supreme Court of Georgia had, despite its prior assumption, "adopted a broad and vague construction" of the phrase so as to violate the Eighth and Fourteenth Amendments. In the underlying case, the Supreme Court of Georgia had relied on the phrase "outrageously or wantonly vile, horrible and inhuman" to affirm Godfrey's two death sentences because, after Godfrey's wife moved out, filed for divorce, and filed a charge of aggravated assault, Godfrey killed her and her mother with single shotgun blasts to each of their heads.

The United States Supreme Court invalidated Godfrey's two death sentences because the Supreme Court of Georgia failed to apply:

> [A] constitutional construction of the phrase "outrageously or wantonly vile, horrible or inhuman in that [they] involved . . . depravity of mind. . . ." [. . . .] The petitioner's crimes cannot be said to have reflected a consciousness materially more "depraved" than that of any person guilty of murder. His victims were killed instantaneously. They were members of his family who were causing him extreme emotional trauma. Shortly after the killings, he acknowledged his responsibility and the heinous nature of his crimes.

446 U.S. at 432-33 (footnote omitted). The Court concluded that there was "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." 446 U.S. at 433.

In contrast, the Supreme Court of Virginia has long recognized that, "[s]ince any act of murder arguably involves a 'depravity of mind' and an 'aggravated battery to the victim', it is conceivable that the language defining the second aggravating circumstance could be tortured to mean that proof of an intentional killing is all the proof necessary to establish [depravity of mind]."

99

Smith, 219 Va. at 478, 248 S.E.2d at 149.  However, the Supreme Court of Virginia found that such a "tortured" interpretation was "strained, unnatural, and manifestly contrary to legislative intent" because the General Assembly "was selective in choosing the types of intentional homicide it felt justified a potential sentence of death" and "did not intend to sweep all grades of murder into the capital class." Id.

By the Supreme Court of Virginia's own definition, depravity of mind constitutes conduct or intent beyond the conduct or intent needed to convict a defendant of non-capital murder, and Morva's jury was instructed consistent with the definition of depravity of mind set by the Supreme Court of Virginia in Smith.  Thus, the Supreme Court of Virginia's interpretation and application does not run afoul of Godfrey and Gregg because there is no basis to find that the Supreme Court of Virginia adopted or applied an open-ended construction of depravity of mind.  Morva further fails to establish that the holding in Godfrey, which critiqued the application of Georgia's death penalty, invalidates the Supreme Court of Virginia's interpretation or application of depravity of mind.

Morva also relies on Maynard v. Cartwright, 486 U.S. 356 (1988), to argue that the jury instruction defining depravity of mind was unconstitutionally vague because the jury was not instructed about what constitutes "baseline quantities of moral turpitude and/or psychical debasement ordinarily inherent in the definition of legal malice and premeditation."  "Without a meaningful standard of reference for these terms," Morva argues, "jurors were left with a standard that could fairly be used to characterize every murder.  Second Am. Pet., Dkt. No. 111, at 154.

In Maynard, the United States Supreme Court held that the aggravating circumstance provision of a state's death penalty statute, which read, "especially heinous, atrocious, or cruel," was

100

Case 7:13-cv-00283-MFU-RSB   Document 141   Filed 04/15/15   Page 100 of 103   Pageid#: 2977

unconstitutionally vague. The Court explained that the terms "especially heinous, atrocious, or cruel" did not provide adequate guidance for the jury's discretion, even with the addition of the word "especially," "because an ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous.'" Maynard, 486 U.S. at 363-64. However, Morva's jury was told that, in order to impose a death sentence, it must determine that Morva's intent and conduct surpassed such intent and conduct of a murderer not eligible for a death sentence. Direct Appeal JA at 2409.

Morva cites the facts of Godfrey in support of his argument that the evidence could not establish depravity of mind. In Godfrey, the wife told the defendant on the phone that their broken marriage was irreconcilable, that she wanted all of the proceeds from a planned sale of their residence, and that her mother supported her position.

> At this juncture, the petitioner got out his shotgun and walked with it down the hill from his home to the trailer where his mother-in-law lived. Peering through a window, he observed his wife, his mother-in-law, and his 11-year-old daughter playing a card game. He pointed the shotgun at his wife through the window and pulled the trigger. The charge from the gun struck his wife in the forehead and killed her instantly. He proceeded into the trailer, striking and injuring his fleeing daughter with the barrel of the gun. He then fired the gun at his mother-in-law, striking her in the head and killing her instantly.

> The petitioner then called the local sheriff's office, identified himself, said where he was, explained that he had just killed his wife and mother-in-law, and asked that the sheriff come and pick him up. Upon arriving at the trailer, the law enforcement officers found the petitioner seated on a chair in open view near the driveway. He told one of the officers that "they're dead, I killed them" and directed the officer to the place where he had put the murder weapon. Later the petitioner told a police officer: "I've done a hideous crime, . . . but I have been thinking about it for eight years . . . I'd do it again."

446 U.S. at 425-26 (ellipses in original).

The facts before the jury in Morva's case transcend those present in <u>Godfrey</u>.  Unlike <u>Godfrey</u>, Morva did not have an on going, troubled personal relationship with the victims, did not promptly report his crimes, and did not turn himself in.  After reviewing Morva's murders, the Supreme Court of Virginia found Morva killed McFarland and Corporal Sutphin with depravity of mind for the following reasons:

> Morva's words contained in a letter written from jail to his mother described his pre-planned intent to kill guards.  Such planning is evidence of Morva's depravity of mind.
>
> Morva viciously attacked a guard who had taken Morva to receive medical treatment, fracturing the guard's face with a metal toilet paper holder that Morva had removed from the wall.  Neither of the men killed by Morva posed a physical threat to him.  Morva shot McFarland, who was passive and unarmed, in the face at point-blank range; he shot Corporal Sutphin in the back of the head while Sutphin's gun was still holstered.  Additionally, Morva had several hours from the time he shot McFarland to consider the consequences of his actions before he shot Corporal Sutphin.  This fact indicates a lack of remorse or regret for his actions.

<u>Morva v. Commonwealth</u>, 278 Va. at 353, 683 S.E.2d at 566-67 (citations omitted).  These reasons are not an unreasonable determination of the facts, and the evidence was sufficient to constitute depravity of mind.  <u>See</u>, <u>e.g.</u>, <u>In re Winship</u>, 397 U.S. 358, 364 (1970) (stating due process requires the elements of a state criminal charge to be proven beyond a reasonable doubt).  The state record, when viewed in the light most favorable to the Commonwealth, shows that Morva expressed a desire to kill a guard, manipulated Deputy Quesenberry for his benefit before bludgeoning him, shot the passive McFarland in the face at close range, and executed Corporal Sutphin with a shot to the back of the head.  Plainly, the Supreme Court of Virginia's adjudication of this claim is not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts, and claim XII must be dismissed.

102

## V.   Conclusion

In <u>Harrington v. Richter</u>, Justice Kennedy, writing for the Court, observed:

> The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law. Judges must be vigilant and independent in reviewing petitions for the writ, a commitment that entails substantial judicial resources. Those resources are diminished and misspent, however, and confidence in the writ and the law it vindicates undermined, if there is judicial disregard for the sound and established principles that inform its proper issuance.

562 U.S. at 91-92. As detailed above, viewed in the light of those sound and established principles, no writ of habeas corpus may issue in this case. In sum, the court concludes that Morva's counsel were not ineffective and that his capital murder trial did not otherwise violate the laws or Constitution of the United States. "[F]undamental fairness is the central concern of the writ of habeas corpus," <u>Strickland</u>, 466 U.S. at 697, and the court is convinced that Morva received a fair trial. Accordingly, the court grants the Warden's motions to dismiss, dismisses the instant petition for a writ of habeas corpus, and grants a certificate of appealability for claim I. A certificate of appealability is denied for all other claims.

Entered:  April 15, 2015

*/s/ Michael F. Urbanski*

Michael F. Urbanski
United States District Judge

103